610 F.2d 1306
 Fed. Sec. L. Rep. P 97,275
Peter PIAMBINO et al., Plaintiffs-Appellees,
v.
William E. BAILEY et al., Defendants,
Bestline Products, Inc., a California Corporation et al.,
Defendants-Appellants.
In re BESTLINE PRODUCTS SECURITIES AND ANTITRUST LITIGATION.
Peter PIAMBINO et al., Plaintiffs-Appellees,
v.
William E. BAILEY et al., Defendants,
David SYLVA, Compliance Officer of the California
Restitutionary Fund, Intervenor-Appellant.
 Nos. 76-3495, 77-2045.
 United States Court of Appeals,
Fifth Circuit.
 Feb. 6, 1980.
 
 J. Russell Pitto, San Jose, Cal. and Marc M. Watson, Miami, Fla., for Bestline, Inc., et al.
 Carl H. Hoffman, Miami, Fla., James H. Joseph, Pittsburgh, Pa., for Piambino, et al.
 David Ferber, Sol., for amicus curiae. Ralph C. Ferrara, Gen. Counsel, S. Lee Terry, Jr., William A. Dietch, Attys., SEC., Washington, D.C.
 Evelyn Langlieb Greer, Miami, Fla., for intervenor-appellant.
 Michael R. Botwin, Deputy Atty. Gen., Dept. of Justice, Los Angeles, Cal., amicus curiae, for people of the State of California.
 William C. Wolford, Asst. Atty. Gen., State of Wisconsin, Madison, Wis., amicus curiae, for State of Wis.
 Appeals from the United States District Court for the Southern District of Florida.
 Before COLEMAN, Chief Judge, GOLDBERG, and RUBIN, Circuit Judges.
 COLEMAN, Chief Judge.
 
 
 1
 This litigation arose from the sale by Bestline Products, Inc.,[1] a California corporation, of direct distributorship contracts (or agreements) for the sale and distribution to the consuming public of its line of personal and home care products. Bestline's direct distributorships were an integral part of its multi-level distributorship system, a species of pyramid sales schemes.[2]
 
 
 2
 The complexities of this case remind us of the ancient Gordian Knot. Involved here are eleven lawsuits transferred to the Southern District of Florida for coordinated or consolidated pretrial proceedings with a suit previously filed in that district.[3] The two appeals taken to this Court from those proceedings, and now before us, have also been consolidated.[4]
 
 
 3
 Included is a class of nearly 40,000 plaintiffs. There are several corporate defendants, a law firm defendant, and over 60 individual defendants. Swept up in the proceedings are scores of lawyers, the attorneys general of seven states, the Federal Trade Commission, and the Department of Justice. Various state and federal courts have decided related cases.
 
 
 4
 In this appeal, the parties have raised many issues, including: (1) the management of class actions and complex litigation; (2) the interpretation of 28 U.S.C. § 2283 (the "Anti-Injunction Act"); and (3) the definition of a "security" for purposes of the federal securities laws.
 
 
 5
 We hold that summary judgment declaring the distributorships to be securities was improvidently entered. After a consideration of all issues we reverse and remand for further proceedings not inconsistent herewith.
 
 I.
 BESTLINE'S ORGANIZATION AND HISTORY[5]
 
 6
 Bestline Products, Inc. began its activities in August, 1966, when defendants William E. Bailey and Jerry G. Brassfield organized a multilevel direct sales organization to sell and distribute a line of biodegradable soap products. Bailey and Brassfield had previously been associated as distributors for Holiday Magic, Inc., a multilevel direct sales company which sold cosmetic products. Those men had additional experience with pyramid sales schemes resulting from their work with several other (ultimately unsuccessful) companies.
 
 
 7
 From its inception, Bestline was a successful venture, at least until the rising flood of lawsuits and regulatory actions began to overwhelm it. Bestline recruited other individuals with experience in multilevel direct sales and grew until it became an operation in all fifty states and several foreign countries. By March, 1972, its initial meager line of cleaning agents and home care products had expanded to sixteen in number. Six of the products were manufactured by Bestline in its own facilities in San Jose, California and Elk Grove Village, Illinois; various other companies manufactured the remaining items.
 
 
 8
 In order to share the ownership of the company with other loyal and devoted participants in its direct sales program, in 1968 Bailey and Brassfield organized the Bestline Corporation and sold their interest in Bestline Products, Inc. to the new corporation for $10 million. They sold some stock in the new corporation to others, but they retained the majority ownership for themselves. Bailey was the chief executive officer and chairman of the board until August 1973, when Brassfield returned to the organization he had left in 1970. As the business expanded, the officers and top executives of Bestline received ever-expanding compensation packages, including sixfigure salaries and such perquisites as use of the corporate aircraft and yacht.
 
 
 9
 The most important factor in Bestline's success, and an equally important factor in its legal problems, was its "National Marketing Plan", a plan that was implemented through three levels of independent distributors. At the lowest level were the "Local Distributors",[6] who paid $5 annual dues and sold Bestline's products directly to the consuming public. At the second, or middle, level were the "Direct Distributors". The status of "Direct Distributor" could be achieved by a Local Distributor who sold approximately $5,000 worth of products in a month. The status could also be obtained by a prepurchase plan. A person could become a Direct Distributor by paying $3,400 in cash; for this sum, the purchaser received classification as a Direct Distributor and soap products having a retail price of $5,000 together with sales aids. Such a purchaser was required to serve as a Local Distributor for seven days and, while a Local Distributor, to buy $100 (later $500) worth of Bestline products. Unlike Local Distributors, Direct Distributors were not required to sell products to the consuming public or even to Local Distributors whom they sponsored. They could engage in recruiting Local Distributors to sell the products, but they could also recruit other persons to become prepurchase Direct Distributors. If a Direct Distributor successfully recruited two new Direct Distributors, he became qualified to move up to the third, and highest, level, that of "General Distributor". This level in the Bestline hierarchy could be attained only by persons who first qualified as Direct Distributors and then satisfied certain other requirements.
 
 
 10
 The district court certified as the class plaintiffs only repurchase Direct Distributors. Thus, the action does not involve Local Distributors, Local Distributors who earned the status of Direct Distributor by selling soap products or General Distributors.
 
 
 11
 Profits at the various levels were in part dependent on the volume of sales to lower levels and to the consuming public. A Local Distributor purchased the products from his sponsoring Direct Distributor at a discount that varied from 30% To 52% Off of the retail price, depending upon his monthly sales. A Direct Distributor purchased the products for resale to his Local Distributors and to the public at a 52% Discount. At the top of the pyramid, a General Distributor purchased the products for resale to his Director Distributors, his Local Distributors, and the public at a 60% Discount.
 
 
 12
 A person at any of the three levels could profit by selling Bestline's products to the public (which all levels were authorized to do) or by recruiting other distributors (which all levels were also authorized to do). In fact substantial sales of Bestline products were made, about $1,000,000 per month at one point. (The record is not clear, however, what part of these sales were made to consumers and what part remained in the hands of various classes of distributors.)
 
 
 13
 As is the case with most such pyramid sales schemes, however, the lure of big profits came not from the opportunity to sell Bestline's products to the consuming public but from the opportunity to recruit others who would in turn recruit or sell. The district court discussed four different methods by which Bestline Direct and General Distributors could profit from the recruitment of new distributors: (1) the release fee; (2) the standard commission; (3) the override commission; and (4) the special incentive bonus (SIB).
 
 
 14
 The release fee practice, which Bestline abandoned in 1970, was the simplest method by which a person in the top level profited from the recruitment aspect of the National Marketing Plan. Under this program, a Direct Distributor who wished to move up was required to pay Bestline a $2750 fee, of which Bestline paid $2250 to the Direct Distributor's sponsoring General Distributor (generally, the one who had initially recruited the Direct Distributor). Ostensibly, this fee was paid to release oneself from his General Distributor's organization and compensate the latter for the loss of commission which would be experienced when the Direct Distributor left that organization. This fee therefore provided General Distributors with an incentive to encourage their Direct Distributors to move up the pyramid. Equally as obvious, however, is the fact that the release fee provided no incentive for Direct Distributors.[7]
 
 
 15
 The second method by which individuals profited from the recruitment of others was the standard commission. This resulted from the 8% Differential in discounts between General and Direct Distributors, and it was applied to all "product movement" between those two levels. This standard commission therefore provided an incentive for General Distributors to recruit more Direct Distributors, to whom they could sell Bestline products at 48% Of retail after having purchased such products from the company at 40% Of retail. The General Distributors could therefore achieve a rapid 20% Return on their outlays.
 
 
 16
 The override commission was a 3% Commission paid to the sponsor of a sponsoring distributor. The sponsor of a sponsoring distributor was entitled to this commission solely because he had initially recruited the initial distributor, even though he may have played no part in the subsequent recruitment. This commission therefore provided an incentive for distributors to recruit people who in turn would be good recruiters and not merely good retailers of Bestline's products.
 
 
 17
 The fourth method, the special incentive bonus, was introduced by Bestline shortly after it eliminated the release fee practice. SIB's were paid on an annual basis to qualifying General, but not Direct, Distributors and were a progressive percentage of product movement. Product movement consisted not only of products that were sold to ultimate consumers, but also of products that remained in the hands of a distributor who either was unable to unload them on another distributor or was unwilling or unable to sell them to the public. A General Distributor had to account for at least $36,000 in product movement to be eligible for any SIB. His commission would be 3.3% At that level, but if he could push $200,000 in products, his commission rate jumped to 15%, or earnings of $30,000.
 
 
 18
 One device utilized by Bestline to advance and implement corporate policy was the monthly meeting of its "Corporate Team", which included key home office officials, assistant vice-presidents, and Regional Directors. These meetings were used to announce changes in policy and to motivate Bestline's personnel. A key feature of these meetings was the constant exhortation to hold "Opportunity Meetings" and to adhere closely to the script provided by the company for use at these meetings.
 
 
 19
 The district court found that dozens, if not hundreds of opportunity meetings were conducted almost daily throughout the United States.[8] These meetings involved the gathering of a group of Bestline distributors and prospective recruits in a hotel or motel meeting room, or any other suitable place. The prospects were systematically exhorted to take advantage of the Bestline "opportunity". To insure uniformity at each of the thousands of Opportunity Meetings, Bestline distributed scripts for speakers to use at such meetings, as well as records, film strips, and copies of the "Bestline Business Opportunity Booklet." Bestline corporate officials frequently conducted the meetings at least to insure adherence to company policy.
 
 
 20
 The Opportunity Meetings were the means by which Bestline distributors were urged to build an "organization" of distributors whom they sponsored. The time and place of each Opportunity Meeting was reported to the Bestline home office and assembled into a regularly published "Corporate Calendar" which listed all the meetings currently planned across the country. By means of this calendar, Bestline distributors could, as they were urged to do by Bestline, refer friends or acquaintances in distant locations to a convenience Opportunity Meeting in their city or locale. If the distant prospect signed up for a distributorship, the referring friend became his sponsor and therefore received a share of the commissions paid on the products purchased from Bestline by the distant prospect, even if the referring friend took no part in the actual recruitment of the distant prospect other than inviting him to the Opportunity Meeting.
 
 
 21
 The Bestline system for computing the amount of regular commissions, override commissions and SIB bonuses which it paid to its distributors was based on Bestline's concept of "product movement," which gave credit for both retail and "wholesale" sales. Because of the Credit for wholesale business, one effect of the "product movement" was to reward distributors for the recruitment of new prepurchase Direct Distributors. And since prepurchase Direct Distributors were required to make large initial purchases to qualify for their position, a General Distributor who sponsored a prepurchase Direct Distributor would receive a substantial commission, and possibly an SIB bonus, on the new distributor's initial purchase, even if the new distributor made no attempt to sell the products which he had purchased to the consuming public. Nor did the new prepurchase Direct Distributor need to sell any of his inventory in order to make a profit. He could instead concentrate his efforts on the "wholesale" part of the business, and try to recruit new prepurchase Direct Distributors whose initial purchases could be applied toward fulfilling his own requirements for becoming a General Distributor. The incentive for becoming a General Distributor is revealed by the fact that, while a General Distributor generally earned a lesser net discount on product sales (as little as 8%) than did a Direct Distributor (as high as 20%), only a General Distributor was entitled to receive commissions and credit toward his SIB bonus for the initial purchases made by newly recruited prepurchase Direct Distributors whom he sponsored.
 
 
 22
 Thus, although the class certified as plaintiffs includes only prepurchase Direct Distributors, the route to highest profits was by becoming a General Distributor. Becoming a Direct Distributor and then recruiting another Direct Distributor was the only way to achieve the top of the pyramid, General Distributor status.[9]
 
 II.
 BESTLINE'S LEGAL BATTLES
 
 23
 Prosperity to the contrary notwithstanding, Bestline soon found itself defending lawsuits brought by the federal government, by the attorneys general of seven states, and by numerous private plaintiffs.
 
 
 24
 In 1971 Bestline entered into a consent decree with the Federal Trade Commission wherein it agreed to cease and desist from alleged unfair trade practices in connection with the recruitment of new distributors.[10]
 
 
 25
 On May 12, 1971, the State of California filed a civil suit against Bestline and certain of its officials Alleging violations of state law.[11] On July 25, 1973, after a lengthy trial, the Los Angeles County Superior Court entered a written judgment in the case, ordering injunctive relief, restitution to certain California Bestline distributors, and a total of $1,902,500 ($1,000,000 against Bestline) in civil penalties. In addition, the order provided for the appointment of a receiver to effectuate the restitutionary provisions. After the state court judge had announced his decision from the bench, but two days before the written opinion issued, Bestline filed a Chapter XI bankruptcy petition in the Northern District of California. That court issued a stay order which prevented the California Attorney General from enforcing the state court judgment.
 
 
 26
 While the Chapter XI proceedings inched forward, extensive negotiations took place. New management took over control of Bestline and the California Attorney General's office negotiated with the new management. These discussions bore fruit on December 21, 1973, when the parties and the Superior Court signed a modified judgment that expanded the restitution program so that certain non-California Bestline distributors could participate in it. Pursuant to this modified judgment, Bestline transferred $4,085,936.61 into an irrevocable restitutionary trust to be administered by the Bank of America. Bestline agreed to make periodic payments, beginning January 1, 1976, to the fund until full restitution had been achieved, and it withdrew its bankruptcy petition. The modified judgment also empowered the Attorney General to seek termination of the trust agreement if Bestline failed to make regular payments. In addition, the court postponed Bestline's payment of $1,000,000 in civil penalties until full restitution had been achieved.
 
 
 27
 Three categories of distributors were eligible to participate in the California restitution program. These were:
 
 
 28
 (1) Each individual who became a Direct Distributor or a Candidate Direct Distributor in California after January 14, 1971, to and including July 25, 1973, and who requests a refund;
 
 
 29
 (2) Any individual who is entitled to restitution pursuant to agreement reached between any other state or political subdivision thereof or any federal department or agency and Bestline Products, Inc., and/or Bestline Corporation.
 
 
 30
 (3) Any other individual who became a Candidate Direct Distributor or Direct Distributor in Bestline in any state other than those specified (above) who has satisfied any of the following conditions: (1) the company approves the claim; (2) the distributor has received an arbitration award pursuant to a national plan of arbitration, or (3) pursuant to judgment.
 
 
 31
 The avowed purpose of this program as modified was to keep the company afloat so that restitution could be maximized. If large judgments were obtained against Bestline, and if subsequent plaintiffs sought to enforce those judgments, the company would become bankrupt. Therefore, any plaintiff obtaining a judgment could elect to join the California restitution program, or he could attempt to enforce his judgment, depending upon his own perception of which course of action he thought would enhance his recovery.
 
 
 32
 Bestline appealed the Superior Court judgment but did not challenge its restitutionary features. The lower court was affirmed on all issues appealed, People v. Bestline Products, Inc., 61 Cal.App.3d 879, 132 Cal.Rptr. 767 (1976).
 
 
 33
 The record does not indicate how many individual cases, if any, proceeded to judgment, but public bodies brought a number of suits which either proceeded to judgment or were settled. The New York City Bureau of Consumer Protection and the Attorneys General of Missouri, Ohio, Pennsylvania, New Jersey, Texas, and Wisconsin successfully brought suits against Bestline on behalf of former Bestline distributors in their respective jurisdictions. All of these seven classes elected to join the California restitution program rather than execute their judgments.
 
 
 34
 In the meantime, private lawsuits against Bestline and various officers of the company were filed in several federal courts across the country, and the scramble for the assets of Bestline began in earnest. For example, on July 20, 1973, counsel for the Piambino plaintiffs filed their class action lawsuit in the Southern District of Florida.
 
 
 35
 Lead counsel[12] for the consolidated actions made several attempts in California courts to disrupt the California restitution payments. The initial effort began on September 20, 1974, when one of the two lead counsel sent a letter to the Bank of America, the fund trustee, claiming that the class had a prior equity in the trust and warning the bank that it "will be held liable to them (the class) for their proportional interest in any funds disbursed after your receipt of this letter." Another letter, dated October 8, 1974, threatened "to commence legal proceedings against the Bank of America to enjoin any distribution of funds from the Bestline trust . . . (and which would seek) recovery of the proportional interest in any funds disbursed by the Bank to which the putative class is entitled." Since the Bank was scheduled to disburse payments to the participants in the restitution program in the near future, it was concerned about these threats and petitioned the California Superior Court for instructions. After a hearing attended by all interested parties, including lead counsel for the Florida class, the state court ordered the bank to make the disbursements. Bestline did not appeal that decision, even though it may have been entitled to do so under state law. See County of Alameda v. Carleson, 5 Cal.3d 730, 97 Cal.Rptr. 385, 488 P.2d 953 (1971).
 
 
 36
 The very next day, lead counsel filed a class action suit in the Northern District of California alleging that the distribution of money through the restitution fund constituted "common law fraud and deceit" and deprived their clients of due process and equal protection. Plaintiffs sought an injunction "restraining Bank of America, (the compliance officer), Bestline, Bestline Corporation, (the California Attorney General) and the Superior Court from issuing any further instructions to (the compliance officer) and/or Bank of America inconsistent with the claims of (the plaintiff class), and restraining Bank of America from any distribution of said funds inconsistent with the rights of (the plaintiff class) to share ratably therein." Counsel then petitioned the Judicial Panel on Multi-district Litigation to treat the action as a tag-along case with the Florida cases. A conditional transfer order was summarily issued, but the defendants promptly moved to vacate that order. After a hearing, the defendants' motion was granted on February 14, 1975, whereupon the parties returned to the Northern District of California, where the court notified all the parties that a hearing would be held on March 28, 1975. Plaintiffs' counsel failed to appear at that hearing, and the court granted the defendants' motion to dismiss under Rule 12(b) With prejudice. Judgment was entered, the plaintiffs appealed, and the Ninth Circuit Dismissed the appeal without opinion.
 
 
 37
 At this point, if not before, the California state court judgments became absolutely final and entitled to full faith and credit.
 
 
 38
 On April 2, 1976, pursuant to a complaint filed by the Federal Trade Commission, the United States District Court for the Northern District of California found that Bestline had violated the injunction issued as a part of the 1971 consent decree. Among other things, the Federal Trade Commission obtained a judgment of $1,036,000 against the defendant, William Bailey, dated July 19, 1976, United States v. Bestline Products Corporation, 412 F.Supp. 754 (N.D.Cal.1976). This money was paid into the registry of that Court.
 
 
 39
 In the meantime, as will hereinafter be related, the District Court in Florida had brought the enforcement of the California state court judgment to a halt by enjoining Bestline from complying with the California state court judgment. The District Court in California transferred the $1,036,000 from its registry to that of the Southern District of Florida for distribution to members of the plaintiff class in that Court.
 
 
 40
 After the total lack of success in both the State and Federal Courts in California, ending with the dismissal of the appeal in the Ninth Circuit, plaintiffs' counsel resorted again to the Southern District of Florida, where discovery proceeded apace.
 
 
 41
 On March 19, 1976, the District Judge rendered an opinion and order granting the plaintiffs' motion for summary judgment on the limited issue of whether the prepurchase Direct Distributorship agreements were "securities" for purposes of the Securities Act of 1933 and the Securities Exchange Act of 1934. Meanwhile, on January 1, 1976, Bestline had made its first scheduled payment of $250,000 to the restitution fund, and it had notified the compliance officer that it would be able to make its second periodic payment, in the amount of $500,000, as scheduled on June 30, 1976. This apparently alarmed lead counsel and on June 18, 1976, less than two weeks prior to the scheduled date of payment, they moved the Florida District Court for a temporary restraining order to prohibit Bestline from transferring the money to the Bank of America. Lead counsel recognized the problem presented by 28 U.S.C. § 2283, the Anti-Injunction Act, and submitted a brief to the District Court arguing that the court could issue the injunction on the ground that the plaintiff class had been deprived of some right secured to it by the 1871 Civil Rights Act, 42 U.S.C. § 1981 Et seq., and on the ground that such an injunction was permitted under the "where necessary in aid of its jurisdiction" exception contained in the statute. The court held a hearing on June 30, 1976, the very day that Bestline was scheduled to make the payment, and after the Bank of America had gone to considerable expense in preparing checks and envelopes for the mailing of individual checks to the approximately 7,043 persons then participating in the restitution program.[13] A representative of the California Attorney General appeared at the hearing and argued, as did the defendants, that 28 U.S.C. § 2283 barred the injunction. From the bench, the District Judge enjoined Bestline from making the payment, and, when the defendants demanded that the plaintiffs post a security deposit for damages in accordance with the requirements of Rule 65(c) of the Federal Rules of Civil Procedure, the Judge decided that the $500,000 would be deposited into the registry of the court and would serve as the security deposit. Unfortunately, we think, the written order completely avoided the question of whether the Anti-Injunction Act barred the injunction. The District Court simply opined that "it would be inequitable to allow the California Plan participants to continue to receive payments from Bestline where the other members of the Plaintiff class were effectively precluded from participating in the California Plan because of matters outside of their control." Thus, after being clearly apprised of the barrier posed by the Anti-Injunction Act, both in written briefs and in oral argument at the June 30 hearing, the District Judge failed to address the problem and issued the injunction.[14] The defendants filed a timely notice of appeal.
 
 
 42
 Bestline's new Chief Executive, Bailey, then began serious settlement negotiations with lead counsel. On October 20, 1976, the District Court entered an order preliminarily approving a settlement between Bailey and the class. The settlement provided that the funds obtained by the FTC and then on deposit in the registry of the court in the Northern District of California would be paid into the registry of the Southern District of Florida in return for a complete release of all claims against Bailey. It further provided that Bailey would not have to pay any money above what he had already paid in the FTC case, and that the funds could be used for the payment of attorneys' fees to Lead Counsel. The District Court, at Bestline's expense, sent notice to all members of the class concerning the proposed settlement and then held hearings, at which the Department of Justice appeared to protest the award of $250,000 in attorneys' fees to Lead Counsel out of funds generated by a successful FTC prosecution. Despite these objections, the Florida District Court concluded that Lead Counsel had made a substantial contribution to making those funds available for the plaintiff class,[15] and awarded the attorneys' fees in an order dated February 25, 1977.
 
 III.
 THE ALLEGED SECURITY
 
 43
 In the appeals now before us, the district court held (1) that there was no genuine issue as to any material fact bearing on the question of whether the prepurchase Direct Distributorships sold to the plaintiffs by Bestline were investment contracts within the meaning of federal securities laws and (2) that Those distributorships were securities.
 
 
 44
 In SEC v. Koscot Interplanetary, Inc., 497 F.2d 473 (5 Cir., 1974), this Court held that for purposes of the Securities Act of 1933[16] and the Securities Exchange Act of 1934[17] a pyramid distribution system is a security. It was recognized that the test for an "investment contract" had been spelled out by the Supreme Court in SEC v. W. J. Howey Company, 328 U.S. 293, 298-299, 66 S.Ct. 1100, 1103, 90 L.Ed. 1244, 1249 (1946):
 
 
 45
 "(A)n investment contract for purposes of the Securities Act means a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits Solely from the efforts of the promoter or a third party. (Emphasis supplied).
 
 
 46
 After analyzing subsequent Supreme Court cases involving the investment contract issue along with lower court interpretations of Howey, and scholarly commentary, the Koscot Court concluded that a literal application of the Howey test, "solely from the efforts of the promoter or a third party", would frustrate the remedial purposes of the Acts. Therefore, the Ninth Circuit standard was adopted: "(W)hether the efforts made by those other than the investor are the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise", 497 F.2d at 483 (quoting SEC v. Glenn W. Turner Enterprises, Inc., 474 F.2d 476, 482 (9 Cir., 1973), Cert. denied, 414 U.S. 821, 94 S.Ct. 117, 38 L.Ed.2d 53 (1937)). As applied to the facts in Koscot, it was held that efforts of the promoters in setting up and conducting the Adventure Meetings, which were designed to entice people to join the scheme, were the "essential managerial efforts" without which the enterprise would fail.
 
 
 47
 Since the Koscot decision the Supreme Court has decided two cases involving the definition of investment contracts, International Brotherhood of Teamsters v. Daniel, 439 U.S. 551, 99 S.Ct. 790, 58 L.Ed.2d 808 (1979), and United Housing Foundation, Inc. v. Forman, 421 U.S. 837, 95 S.Ct. 2051, 44 L.Ed.2d 621 (1975).[18]
 
 
 48
 In both decisions, rejecting the arguments of the Securities and Exchange Commission, the Supreme Court reversed lower court holdings that the transactions at issue were investment contracts, and hence securities. The significant thing is that the Court expressly reaffirmed the test first enunciated in Howey, which had been on the books for thirty years.
 
 
 49
 In Forman the Court stated, "(t)he touchstone is the presence of an investment in a common venture premised On a reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others "[19] (emphasis added), 421 U.S. at 852, 95 S.Ct. at 2060.
 
 
 50
 It should be noted that the test is to be applied in light of "the substance the economic realities of the transaction rather than the names that may have been employed by the parties", Daniel, supra, 439 U.S. at 558, 99 S.Ct. at 796.
 
 
 51
 In Forman, the Court emphasized, that, "in searching for the meaning and scope of the word 'security' in the Act(s), form should be disregarded for substance and the emphasis should be on economic reality", 421 U.S. at 848, 95 S.Ct. at 2058.
 
 
 52
 As in Koscot and Turner, as well as in SEC v. Galaxy Foods, Inc., 556 F.2d 559 (2 Cir., 1977), and Bell v. Health-Mor, 549 F.2d 342 (5 Cir., 1977), there were two distinct aspects to the distribution system set up by Bestline. These were the Retail sales portion of the business on one hand and the recruiting portion on the other, but it would appear, without our so deciding, that these aspects were both integral parts of one common scheme. The degree of investor participation and control differed significantly with respect to each of these aspects.
 
 
 53
 Following the approach applied in Securities and Exchange Commission v. United Benefit Life Insurance Company, 387 U.S. 202, 207, 87 S.Ct. 1557, 18 L.Ed.2d 673 (1967), the district court here, like the courts in Turner, Koscot, Galaxy, and Health-Mor, separated these distinct aspects of the Bestline operation for purposes of its analysis. It also discussed the Howey formation of "profits" as meaning either "capital appreciation resulting from the development of the initial investment" or "a participation in earnings resulting from the use of investors' funds", 421 U.S. at 852, 95 S.Ct. at 2060.[20]
 
 
 54
 It is apparent that the purchasers of Bestline Direct Distributorships would not profit by "capital appreciation resulting from the development of the initial investment". Neither is there any indication that prepurchasers of Direct Distributorships expected a "participation in earnings resulting from the use of investors' funds".
 
 
 55
 This relegates us to the standards long ago articulated, and more recently reaffirmed, by the Supreme Court.
 
 
 56
 An examination of the Bestline Business Opportunity Booklet, coupled with the Applications, Qualification Forms, and Agreements required to be executed by Direct Distributors, clearly established that the efforts of Bestline and its "Corporate Team" certainly constituted the "common thread" on which all of the distributor's "beads" were strung, See Securities and Exchange Commission v. C. M. Joiner Leasing Corp., 320 U.S. 344, 348, 64 S.Ct. 120, 88 L.Ed. 88 (1943).
 
 
 57
 The person directing the Opportunity Meeting asks his audience of prospective joiners, "How do you do it? You get plenty of help. * * * We all work together on this " (App. 32a-33a, emphasis supplied).
 
 
 58
 Actually, it was not the Direct Distributorship, as such, but the General Distributorship that purportedly would yield the anticipated great returns. It was at the latter level that Bestline emphasized the building and supervisory aspects of the business, with which Bestline promised "plenty of help". The assurances of "plenty of help" infers that the person receiving that help would also have to be exerting efforts of his own, else there would be no need for help. "We all work together on this" could be construed as notice that it would be necessary for the "investors" to "work".
 
 
 59
 Becoming first a Direct Distributor was prerequisite to becoming a General Distributor but the "over-all facts" and Bestline's presentation might be construed as holding out a promise that a prepurchase Direct Distributor would never have to retail the product at all; he would simply have to locate other prospects and bring them to the meetings, thus jumping immediately to General Distributorship level without exerting substantial effort.
 
 
 60
 There were parts of the Bestline presentation which would support a finding by a judge or a jury that no reasonable "investor" could have believed that he was relying Solely on Bestline. At the General Distributors meetings the presentation constantly emphasized the retail aspects of the business. "The retail part may seem very elementary to you but I want you to understand how important it is, particularly to a General Distributor. . . . Although you're at 60%, 60% Of nothing is nothing, so it's vitally important that sales occur, and of course, it is your job to assure that they do". The presentation then discussed the non-retail aspects of the business building an organization and supervising it. The General Distributor's responsibility was to "train and motivate these people to do a good job". How? Plenty of help. It is implicit in this reference that retail sales will take place. The night meeting emphasized retail sales and the saleability of the product.
 
 
 61
 The meeting leader then discussed the prepurchase plan. This discussion focused on recruitment since that was integral to advancing from Direct Distributor to General Distributor. Moreover, the promise of greatest profits was linked to becoming a General Distributor. The meeting also discussed the risk involved and there was evidence that might lead the trier of fact to conclude that Bestline intended to dispel (and dispelled) the belief that it was promising profits with no expenditure of effort. The presentation listed three ways to generate product movement volume: (1) retail sales through one's own accounts. "It generally takes experience in commercial selling to be successful in that area. But if you have that experience or acquire it, that can be one way . . . " (2) Simpler for those without sales experience is to sell that amount through local distributors. (3) "Strictly a hypothetical illustration", would be by recruiting people as Direct Distributors and training them as General Distributors. "You must train your people and continue to work closely with them". Finally, the printed material accompanying the Bestline presentation did mention personal efforts by the Direct Distributor.
 
 
 62
 In a summary judgment context what it all comes down to is:
 
 
 63
 1. Different inferences could be drawn from the facts in the record as to whether the Bestline Direct Distributorship Plan could be separated into two parts;
 
 
 64
 2. If the fact finder (judge or jury) were to hold that the Direct Distributorship Plan could be separated into two parts, one of which would be the recruitment of Direct Distributors, different inferences could be drawn from the facts in the record as to whether anticipated profits were to come solely by Bestline's efforts, with no substantial personal effort on the part of the "investor".
 
 
 65
 This, of course, would be determined on the expectations of a "reasonable investor" as prompted by Bestline's standardized presentation, rather than the subjective beliefs of any particular individuals, See International Brotherhood of Teamsters, supra, 99 S.Ct. at 797; United States Housing Foundation, Inc. v. Forman, 421 U.S. at 852, 95 S.Ct. 2051. The motivation of particular individuals might vary; the application of the statute must be objectively based.
 
 
 66
 What a "reasonable investor" would under all the circumstances expect is for determination by the trier of fact in much the same manner as the determination of what a reasonable person would or would not have done concerning acts claimed to have been negligent. Such issues can properly be resolved by summary judgment only if (1) there is no genuine dispute concerning any material fact and (2) no conflicting inferences could be drawn from those established facts.
 
 
 67
 After considering all the facts most favorably to the party against whom summary judgment is sought summary judgment may be entered, of course, if no jury could reasonably reach any conclusion except that reasonable investors did (or did not) believe they were buying into an enterprise whose profits would be determined by Bestline managerial and entrepreneurial methods with no substantial effort by the investor. Up to now, however, this is not such a case.
 
 
 68
 On what we have before us, the entry of summary judgment must be reversed and the case remanded for further proceedings conducted consistently with the applicable jurisprudence.
 
 
 69
 It should not be necessary for us to say that we intimate no opinion whatever as to how this case should be resolved on remand.
 
 IV.
 SYLVA'S APPLICATION TO INTERVENE
 
 70
 It is well settled that one who has sought intervention of right may appeal from an order denying his application and that an appellate court will reverse if it concludes that he was entitled to intervene of right. Cascade Natural Gas Corp. v. El Paso Natural Gas Co., 386 U.S. 129, 87 S.Ct. 932, 17 L.Ed.2d 814 (1967); Stallworth v. Monsanto Co., 558 F.2d 257, 263 (5th Cir. 1977). In its order entering final judgment as to certain of the defendants, dated March 22, 1977, the District Court denied Sylva's petition to intervene as "both untimely and without merit". Thus, the Court concluded that Sylva did not satisfy Rule 24(a)'s requirements that an application for intervention of right be timely and that, on the merits, "(1) the applicant claims an interest relating to the property or transaction which is the subject of the action and (2) he is so situated that the disposition of the action may as a practical matter impair or impede his ability to protect that interest, unless (3) the applicant's interest is adequately represented by existing parties." Fed.R.Civ.P. 24(a).
 
 
 71
 In the recent case of Stallworth v. Monsanto Co., supra, we exhaustively surveyed the jurisprudence on Rule 24's "timeliness" requirement and recognized that this question is largely committed to the discretion of the district court. Consequently, its determination will not be overturned on appeal unless an abuse of discretion is shown. Id. at 263. Although such discretionary determinations must necessarily consider all the facts and circumstances of the particular case, NAACP v. New York, 413 U.S. 345, 366, 93 S.Ct. 2591, 2603, 37 L.Ed.2d 648 (1973), the Stallworth panel identified four factors which must, as a minimum, be considered in passing upon the timeliness of a petition to intervene. These factors were listed as: (1) the length of time during which the would-be intervenor actually knew or reasonably should have known of his interest in the case before he petitioned for leave to intervene; (2) the extent of the prejudice that the existing parties to the litigation may suffer as a result of the would-be intervenor's failure to apply for intervention as soon as he actually knew or reasonably should have known of his interest in the case; (3) the extent of the prejudice that the would-be intervenor may suffer if his petition for leave to intervene is denied; and (4) the existence of unusual circumstances militating either for or against a determination that the application is timely. Id. at 264-66.
 
 
 72
 Proper consideration of these factors generally cannot be divorced from a consideration of the merits of a prospective intervenor's application, however. For instance, factor 1 clearly requires an initial identification of the prospective intervenor's interest in the case, and factor 3 requires a similar identification of that interest in order to assess the potential of prejudice to him. Furthermore, the question of timeliness is at least partially linked to the question of adequate representation. See United Airlines, Inc. v. McDonald, 432 U.S. 385, 394, 97 S.Ct. 2464, 2470, 53 L.Ed.2d 423 (1977) ("as soon as it became clear to the (intervenor) that the interests of the unnamed class members would no longer be protected by the named class representatives, she promptly moved to intervene to protect those interests."); Allegheny Corp. v. Kirby, 344 F.2d 571, 574 (2d Cir. 1965) (timeliness also turns on "when the interests of the proposed intervenors were no longer properly represented") (construing pre-1966 rule). Due to these problems, we should analyze the merits of Sylva's application to intervene before considering whether it was timely.
 
 
 73
 First, what interest does Sylva have "relating to the property or transaction which is the subject of the action"? Our cases have required that intervention of right be supported by a "direct, substantial, legally protectable interest in the proceedings." See United States v. Perry County Bd. of Education, 567 F.2d 277, 279 (5th Cir. 1978); Diaz v. Southern Drilling Corp., 427 F.2d 1118, 1124 (5th Cir. 1970), Cert. denied sub nom. Trefina A. G. v. United States, 400 U.S. 878, 91 S.Ct. 118, 27 L.Ed.2d 115 (1970). Furthermore, Sylva "has standing to prosecute a suit in the federal courts only if he is the 'real party in interest' as that term is defined under Fed.R.Civ.P. 17(a). The stricture applies to intervenors as well as plaintiffs." United States v. 936.71 Acres of Land, More or Less, in Brevard County, State of Florida, 418 F.2d 551, 556 (5th Cir. 1969).
 
 
 74
 Sylva admits that he has never been a Bestline distributor at any level, nor has he ever been an employee or stockholder of the corporation. Although he sought to intervene on behalf of the 7,043 participants in the California restitution fund and to be appointed as a representative of a subclass consisting of those persons, we need not consider whether such an interest would satisfy Rule 24(a) because Sylva clearly has another interest in this litigation which he may assert, namely, his own duties as Compliance Officer in administering the restitution fund and as receiver of the Bestline properties in California.
 
 
 75
 It is the general rule that courts must look to the substantive law creating the right being sued upon to determine compliance with the real party in interest requirement, and for at least two reasons we look to California law in order to measure Sylva's claims. First, Sylva seeks to intervene in his capacity as the Compliance Officer of a restitution fund which was set up by a state court judgment to remedy violations of state law. In order to participate in that fund, every direct distributor with a judgment was required to waive "any and all rights and remedies available to him against corporate defendants with the exception of those rights and remedies available under the plan of restitution". This is obviously an interest created by the substantive law of California. Second, although this case involves primarily claims assertedly arising under federal law, it also involves pendent state law claims which the settlement purports to extinguish. At least to protect the interests of the California fund participants in those claims, we should look to California law.
 
 
 76
 We are satisfied that, as Compliance Officer, Sylva is the trustee of an express trust who may sue in the California state courts under Cal.Civ.Proc. Code Section 369 (West 1973), and in the federal courts under Fed.R.Civ.P. 17(a). Under California law, "(t)he nature, extent, and object of a trust are expressed in the declaration of trust", Cal.Civ.Code Section 2253 (West 1973), and the primary rule in the construction of trusts is that the court must, if possible, ascertain and effectuate the intention of the trustor. Ephraim v. Metropolitan Trust Company of California, 28 Cal.2d 824, 834, 172 P.2d 501 (1946). In this case, the Superior Court is the trustor, See Cal.Civ.Code Section 2252 (West 1973), and we must therefore discern the intention of that court in creating the trust. "(W)hen a declaration of trust is made in writing, all previous declarations by the same trustor are merged therein," Id. at § 2254, but when documents are executed contemporaneously with the trust agreement and are cross-referenced to each other, as were the Modified Judgment, Instructions to Compliance Officer, and Trust Agreement in this case, they must be regarded as one instrument. See Security-First Nat. Bank of Los Angeles v. Ogilvie, 47 Cal.App.2d 787, 792, 119 P.2d 25 (1941). Finally, the terms of a trust agreement may empower someone other than the named trustee to sue and be sued on behalf of the beneficiaries of the trust. Cf. Powers v. Ashton, 45 Cal.App.3d 783, 119 Cal.Rptr. 729 (1975).
 
 
 77
 The California restitution fund was formally established by three separate documents the Modified Judgment, the Instructions to Compliance Officer, and the Trust Agreement, all of which were signed in December 1973. The Trust Agreement is somewhat brief and contains only 12 short paragraphs. It named the Bank of America as trustee of the "irrevocable, express trust", and spelled out the trustee's duties. These were: (1) to maximize the interest earned by the corpus of the trust; (2) to distribute payments to the participants in the fund as directed by the Compliance Officer; (3) to account to Bestline, the California Attorney General and the Compliance Officer for all payments made from the fund; and (4) to pay the fees and expenses of the Compliance Officer after Bestline and the California Attorney General had approved them. The agreement also expressly mentioned the Instructions to Compliance Officer (a copy of which was attached to the Trust Agreement) and stated that the Bank of America "shall have no discretion or authority or responsibility under the provisions of (the Instructions)." Finally, the agreement stated that it was to be governed by the laws of California, and it did not affirmatively state that the Bank of America was to have the duty to enforce the rights of the beneficiaries whom it represented.
 
 
 78
 In contrast to the Trust Agreement, the Instructions to Compliance Officer is a detailed document and defines the Compliance Officer's duties quite explicitly and definitively. He was to send proof of claim forms to each former distributor who became eligible to participate in the fund and to calculate the amount of refund due each person returning such form. He was to make the restitutionary payments on a pro rata basis according to a schedule established in the Instructions. Most importantly, the Instructions provided that "Said Compliance Officer shall have full and complete authority and power to supervise, control, carry out, oversee and enforce the restitutionary provisions set forth herein. Said Compliance Officer shall perform all necessary and proper acts to effectuate said purpose." To insure his ability to carry out these responsibilities, the Instructions granted him "all necessary power and authority to employ persons and legal counsel to assist him" and provided for the payment of his reasonable fees and expenses from the trust fund.
 
 
 79
 Thus, it seems apparent that the express trust created by the California Superior Court contemplated a division of authority and responsibility. The Bank of America was to control and invest the funds and to make the payments as directed by the Compliance Officer. These duties are among those normally assumed by a trustee and are mainly ministerial. The Compliance Officer, although not formally designated as the "trustee" assumed significantly more important responsibilities and was, in fact, the real fiduciary in the arrangement. The Court gave him broad oversight responsibilities, charged him with enforcing the restitutionary provisions, and gave him the means (financial resources and manpower) to carry out his responsibilities. We have not the faintest doubt that the California Superior Court contemplated that the Compliance Officer, and not the Bank of America, would assume that vital and essential duty the enforcement of the terms of the express trust on behalf of the beneficiaries of the trust through legal action if necessary. We therefore conclude that the Compliance Officer is a "trustee of an express trust" within the meaning of that term in Rule 17(a), and is a real party in interest for purposes of this litigation.
 
 
 80
 Any doubts which might have been entertained about the correctness of that conclusion have surely been dispelled by subsequent events. The Compliance Officer has kept himself abreast of the litigation in Florida from its inception and has been involved in several proceedings in the California Superior Court. In fact, Lead Counsel for the plaintiffs in this case even though that the Compliance Officer was such a critical actor that they named him as a defendant in their class action suit filed in the Northern District of California and sought to have him enjoined from issuing any further instructions to the Bank of America inconsistent with the claims of the plaintiff class. See p. 1314, Supra. When that fact is considered, it is, to say the least, disingenuous for the plaintiffs now to deny that Sylva has any interest in the instant proceedings and to claim that the District Court properly denied his intervention.
 
 
 81
 The preceding discussion leads inexorably to the conclusion that Sylva, in his position of Compliance Officer, was in fact a trustee and, as such, had a "direct, substantial, legally protectable interest" in these proceedings.[21] He has at all times acted in the best interests of the beneficiaries of the restitution fund, and the Florida litigation directly affected his ability to fulfill those responsibilities. Indeed, as will be demonstrated shortly, the Florida litigation threatened to snuff out his ability to comply with the directives of the California Superior Court.
 
 
 82
 We also think it quite clear that Sylva, as Compliance Officer, was so situated that the disposition of the action would as a practical matter impair or impede his ability to protect his interest as the representative of the restitution fund. Not only did the District Court intend to liquidate Bestline's assets, but he intended to distribute the proceeds Only to class members "who have not previously been admitted to participation in the California restitutionary fund." Furthermore, all members of the California fund would be bound by the Florida judgment, except for those who had opted out early in the proceedings.
 
 
 83
 The manner in which the California fund members were treated in this litigation is illustrated well by the series of notices which they received. On November 22, 1974, the District Court certified a class of plaintiffs consisting of
 
 
 84
 all persons who purchased or invested in Direct Distributorship contracts or agreements, or their equivalents, offered by Bestline Products, Inc., who never qualified as General Distributors of Bestline Products, Inc., or their equivalents, and who have not re-ordered products from Bestline Products, Inc., within the six (6) months next preceding the date of this order. . . .[22]
 
 
 85
 On January 15, 1975, the court notified potential class members, including participants in the California fund, that a class had been designated and that unless they requested exclusion, their interests would be represented by lead counsel. At that time, the California fund had just made its second payment, and many of the participants undoubtedly were confused by this notice of yet another lawsuit. A substantial percentage took no action and thereby became members of the class. When the District Court's injunction prevented the mailing of the mid-1976 payments, many of the California fund participants became anxious about the delay and contacted the Compliance Officer, who informed them that an appeal had been taken and that there was no cause for alarm. In December 1976, the District Court preliminarily approved the settlement with William Bailey and sent notice to all members of the class, along with a proof of claim form. This notice, however, clearly stated that No payments would be distributed to persons who had previously participated in the California fund. It also stated that the Court expected to take no further action with respect to the money obtained from Bestline until its appeal had been decided; as events later unfolded, this promise proved to be an empty one. Understandably, many of the California group did not return proof of claim forms to the court. In December 1977 the court preliminarily approved the Bestline settlement and then sent notice of the proposed settlement Only to those persons who had returned the proof of claim forms. Thus, it appears that the California fund participants were lulled into mistakenly thinking that their rights were being protected and that they were members of the plaintiff class. Suddenly, the court informed them that they would not participate in the funds distributed pursuant to the settlement. When they did not return proof of claim forms because they knew that they would get no money, the court declined to send them notice of the final, more important settlement (to be discussed, post).
 
 
 86
 Thus, the members of the California group were not given the treatment contemplated by the law, and they would be bound by a final judgment which completely shut them off from any hope of monetary recovery. It necessarily follows that Sylva's ability to protect his interest as a trustee would not only be impeded or impaired, but it would be utterly destroyed.
 
 
 87
 Much of the foregoing discussion makes it clear that Sylva was not represented at all in this litigation when the parties agreed to a settlement, one provision of which was that Bestline would abandon its appeal to this Court. Sylva was then, and only then, left "without a friend in this litigation." See Atlantis Development Corp. v. United States, 379 F.2d 818, 825 (5th Cir. 1967).
 
 
 88
 To sum up, we conclude that, on the merits, Sylva was entitled Of right to intervene.
 
 
 89
 The only remaining inquiry is whether his application was timely.
 
 
 90
 Each of the Stallworth factors on timeliness points toward the conclusion that the application was timely. First, although the Compliance Officer knew as early as June 30, 1976, when the injunction issued, that he had an interest in the litigation that might be impaired, there was absolutely no reason for him to intervene at that time. Bestline immediately appealed and filed a sterling brief with this Court. In addition, Bestline's attorneys met on several occasions with the Compliance Officer, the California Attorney General, and the Superior Court Judge and assured these people that they were prosecuting the appeal diligently and in good faith.[23] In reliance upon those representations, and upon the obviously adequate representation of Bestline's attorneys, the Superior Court Judge refused the Attorney General's request for a receivership and Sylva did not attempt to intervene. On January 28, 1977, when the settlement agreement was filed, Sylva then knew that his interests were no longer adequately represented by Bestline, and his motion to intervene was filed on February 14. This delay of a mere seventeen days cannot rationally be denominated as unreasonable.
 
 
 91
 Furthermore, the existing parties have suffered no prejudice from the delay. This is not a case where intervention was attempted after the entry of a final judgment, See United Airlines, Inc. v. McDonald, 432 U.S. 385, 97 S.Ct. 2464, 53 L.Ed.2d 423 (1977); McDonald v. E. J. Lavino Co., 430 F.2d 1065, 1072 (5th Cir. 1970); nor is it a case where more hearings must be held in the lower court. In this case, Sylva presented three witnesses at the hearing on the settlement and fully developed his position. The parties are in exactly the same position they would be if some members of the class had objected to the settlement and then taken an appeal to this Court. As has already been demonstrated, there was a distinct probability that the confusing, if not deceptive, series of notices guaranteed that no members of the California group would appear at the hearing to protest the settlement.[24] In short, the parties have not been prejudiced legally by the brief delay in filing the application to intervene.
 
 
 92
 It is unnecessary for us to recount the substantial prejudice which will be visited upon Sylva and the members of the California group if his motion to intervene is denied. In addition to the facts already recounted, it should be noted that the District Court also intended to appoint a receiver with instructions to liquidate all of Bestline's assets. Such an action might have affected Sylva's ability to carry out the Superior Court's instructions to him to liquidate Bestline's California assets. We also think that the manner in which this group was treated in the Florida litigation, including the fact that the District Court failed to employ the subclassing power spelled out in Rule 23(c)(4)(B) and to designate a representative for the California group, is an "unusual circumstance" militating for a determination that the application is timely. See Stallworth, supra at 266,
 
 
 93
 Therefore, we hold that it was error as a matter of law to deny Sylva's application to intervene and we reverse on this point.
 
 V.
 THE BAILEY AND BESTLINE SETTLEMENTS
 
 94
 By separate orders, the District Court approved two settlements. In the first order, dated February 15, 1977 (the Bailey Settlement), the Court entered final judgment as to defendant William Bailey and dismissed all claims against Bailey with prejudice. Bailey gave no consideration whatsoever for the release of these claims; the Court's order merely directs him to apply to the Northern District of California pursuant to the final judgment in the FTC case for an order directing the clerk of that court to transfer the amount of $1,036,000 to the Southern District of Florida. No notice of appeal was filed from the February 15 order, nor could there have been due to the lack of a Rule 54(b) certificate. On February 25 the District Court directed the payment of $250,000 in attorneys' fees to lead counsel from the Bailey settlement funds.
 
 
 95
 In the second order, dated March 22, 1977 (the Bestline Settlement), the District Court approved a settlement to which Bestline and 27 individual defendants had subscribed. In return for the dismissal of all claims against them with prejudice, the defendants agreed: (1) to pay $900,000 (collectively); (2) to tender a note for $300,000 (executed by Bestline Products, Inc. and guaranteed by Brassfield); (3) to pay whatever sums might be realized by liquidating Bestline's assets (approximately $600,000); and (4) to waive any claim to the $491,636.59 deposited with the court pursuant to the preliminary injunction, plus interest. This settlement also provided that attorneys' fees of $750,000 and expenses of up to $50,000 would be paid out of this fund. The March 22 order both denied intervention and entered final judgment as to the settling defendants.
 
 
 96
 Our jurisdiction to review the merits of the settlement can be supported on three grounds. First, this may be a case for invoking the "hardship finality" doctrine of Forgay v. Conrad, 47 U.S. (6 How.) 201, 12 L.Ed. 404 (1848), since the District Court immediately ordered the payment of attorneys' fees out of the settlement proceeds. This was surely an execution on the judgment. See generally 15 C. Wright, A. Miller & E. Cooper, Federal Practice & Procedure § 3910 (1976). In the circumstances of this case, there seems to be no reason not to review the merits of the settlement since the intervenor has already presented his evidence and arguments to the lower court. Second, the order entered final judgment as to Bestline, which had been enjoined by the court since June 30, 1976. The order was therefore appealable under 28 U.S.C. § 1292(a)(1) as an interlocutory order dissolving an injunction. Finally, the order appointed lead counsel as "trustees" of the real and personal property of Bestline with instructions to liquidate the property within six months in a commercially reasonable manner. We have no doubt that this was in effect an appointment of a receiver and was an order appealable under 28 U.S.C. § 1292(a) (2). "A receiver by any other name, or by no name, is still a receiver." United States v. Sylacauga Properties, Inc., 323 F.2d 487, 490 (5th Cir. 1963).
 
 
 97
 We shall examine only Sylva's objections to the Bestline settlement.
 
 
 98
 Rule 23(e) requires the trial judge to review any proposed settlement of a class action. The purpose of this salutary requirement is to protect the nonparty members of the class from unjust or unfair settlements affecting their rights. 7A C. Wright & A. Miller, Federal Practice & Procedure § 1797, at 226 (1972). Conflicts may arise between the attorney and the class, between the named plaintiffs and the absentees, and between various subclasses.
 
 
 99
 To minimize the first conflict that between the attorney and the class district courts must address the issue of attorneys' fees under the standards of Johnson v. Georgia Highway Express, 488 F.2d 714 (5th Cir., 1974). If the agreement leaves attorneys' fees to be fixed by the Court then, as stated in In re Air Crash Disaster at Florida Everglades, 549 F.2d 1006, 1021 (5th Cir. 1971):
 
 
 100
 The district court must set and conduct a hearing in the full sense of the word and must address the fee issue under the Johnson standards. (C)ounsel must offer relevant evidence and must be available for cross-examination. The court should enter findings of fact and conclusions of law setting out the basis for the fee award and adequately presenting the issue for further appellate review should this be necessary.
 
 
 101
 See also Norwood v. Harrison, 581 F.2d 518 (5th Cir., 1978); Premier Corp. v. Serrano, 578 F.2d 566 (5th Cir.), Cert. denied sub nom. Premier Corp. v. Shevin, Shapo & Shevin, P. A., 439 U.S. 1003, 99 S.Ct. 613, 58 L.Ed.2d 678 (1978). If he has not done so, then he must require that notice be given to the class of the proposed attorneys' fees as well as the rest of the settlement agreement and afford anyone who objects an opportunity to be heard. Finally, he must himself determine whether the attorneys' fees proposed are reasonable. A district court is not bound by the agreement of the parties as to the amount of attorneys' fees. Foster v. Boise-Cascade, Inc., 577 F.2d 335 (5th Cir. 1978), affirming 420 F.Supp. 674 (S.D., Tex., 1976). In fixing the amount of attorneys' fees the court must, of course, take all of the Johnson criteria into account, including the difficulty of the case and the uncertainty of recovery. He is not, however, merely to ratify a pre-arranged compact.
 
 
 102
 The second and third conflicts are much more difficult to prevent and police. Generally, courts depend upon structuring the settlement process to promote adequate representation and, hopefully, fair settlements. As a backstop, the law requires that the trial court evaluate whether the settlement is fair, adequate and reasonable and is not the product of fraud or collusion. Pettway v. American Cast Iron Pipe Company, 576 F.2d 1157, 1169 (5th Cir. 1978); Cotton v. Hinton, 559 F.2d 1326, 1330 (5th Cir. 1977); Miller v. Republic National Life Insurance Company, 559 F.2d 426, 428, 429 (5th Cir. 1977); Young v. Katz, 447 F.2d 431, 433 (5th Cir. 1971). Against these concerns must be weighed the general policy of the law to favor settlements and to uphold them whenever possible because they produce an amicable resolution of disputes and minimize demands on judicial time and resources. Pettway, supra, at 1214; Miller, supra, at 428.
 
 
 103
 We are convinced that the District Court fell into serious error when it approved the attorneys' fees proposed in the Bestline settlement. The order entering final judgment states:
 
 
 104
 This court is not being asked to set reasonable attorney's fees in conjunction with the instant settlement; rather the court is being presented with a proposed settlement, agreed to by all parties and unopposed by the class, which incorporates an award of attorney's fees in the amount of $750,000 as a vital part of the settlement. Certainly, different procedures and considerations might obtain were the court being requested to initially fix an attorney's fee. Since the award and amount of attorney's fees comes before the court in the posture of an unopposed settlement, the court finds that the amount is reasonable under the circumstances of this protracted and complicated case. (Emphasis in original.)
 
 
 105
 On this reasoning, the District Court abdicated its responsibility to assess the reasonableness of attorneys' fees proposed under a settlement of a class action, and its approval of the settlement must be reversed on this ground alone.
 
 
 106
 On this appeal, the parties to the settlement urge that the record is adequately developed to enable this Court to independently evaluate the reasonableness of those fees. This is not our normal practice, however, since the District Court is infinitely better situated to conduct the factual inquiry necessary under Johnson, and since we are not asked to determine reasonable attorneys' fees incident to an appeal to this Court. See Davis v. Roadway Express, Inc., 590 F.2d 140 (5th Cir. 1979).
 
 
 107
 Regrettably, this does not end the matter. For reasons about to be stated, we must vacate in its entirety the order entering final judgment as to Bestline and 27 individual defendants.
 
 
 108
 This is demanded by the failure to assess the interests of the two categories of plaintiffs and whether the settlement was fair, adequate and reasonable As to each.[25] One group of plaintiffs was comprised of the 7,043 participants in the California restitution fund, all of whom had either reduced their claims against the defendants to a judgment or had settled. Approximately.$4.5 million had been distributed to these persons before the District Judge issued his preliminary injunction halting further payments from Bestline to the Bank of America. Although that recovery may seem large when compared to the proposed settlement in this case, it must be remembered that those 7,043 people had an average claim against Bestline of $3000 each, for a total claim of perhaps $21 million. Rather than execute their judgments and force Bestline into bankruptcy, those 7,043 people chose to accept smaller installment payments and to keep Bestline afloat for the greater good of all concerned. Cf. Marshall v. Holiday Magic, Inc., 550 F.2d 1173, 1178 (9th Cir. 1977) (approving a similar settlement in a pyramid scheme nearly identical to that involved in this case). Since the issuance of the preliminary injunction, Bestline has failed to make at least $4,500,000 in payments to the California restitution fund. See note 14, Supra. Therefore the members of the fund have been deprived of over $600, on the average, to which they were entitled as a result of their judgments against Bestline. The interest of these 7,043 people in protecting their judgments has not been adequately recognized or protected. This is not a bankruptcy proceeding in which the debtor's assets are being parcelled out to creditors on an equitable basis.[26] The participants in the California fund all had judgments that were entitled to full faith and credit under Article IV of the Constitution and 28 U.S.C. § 1738. As the amicus brief filed by the State of Wisconsin indicates, those 7,043 people waived their rights to pursue any claims against Bestline, either as part of their judgments or upon joining the California fund. Unless those waivers were somehow not entitled to full faith and credit, it would seem that those 7,043 people never should have been included in the class. The record on appeal does not permit us to rule definitively on this point, however, and we shall assume that the California fund participants constituted a subclass in this litigation. Unless it was proper for the District Judge to enjoin Bestline from complying with those judgments, a question which is answered in the negative in part VI of this opinion, the District Court erred by not making the California group whole out of the settlement proceeds, or at least according them an absolute priority to all such funds. Furthermore, since those 7,043 people were already entitled to such funds (up to $4,500,000 plus interest), this litigation has generated no common fund from which to pay attorneys' fees and expenses.
 
 
 109
 Thus, the result which we reach, by assuming that the 7,043 California fund participants were properly included in the class as defined by the District Court, is the same as that which would have been reached if those persons had not been included in the class and if the preliminary injunction had not issued. By concluding that those persons are entitled to settlement proceeds up to $4,500,000 plus interest, they are placed in the same position they would have been in if Bestline had made all the scheduled payments to the trustee. If, however, Bestline would have defaulted on those payments before now, the California class would still have obtained Bestline's assets through liquidation long before this settlement.
 
 
 110
 Therefore, the order approving the Bestline settlement and entering final judgment as to the subscribing defendants is vacated in its entirety.
 
 VI.
 THE PRELIMINARY INJUNCTION
 
 111
 In the face of Rule 52(a)'s requirement that courts set forth findings of fact and conclusions of law which form the grounds for granting interlocutory injunctions, and after having been clearly apprised of the barrier presented by 28 U.S.C. § 2283 (the "Anti-Injunction Act"), both by briefs and oral argument, the District Judge brushed past the statute in the belief that it would be "inequitable" not to issue the injunction. Since the appeal in No. 76-3495 has not been dismissed, and since Bestline has represented to this Court that it would not move to dismiss if Sylva were allowed to intervene in No. 77-2045, we clearly have jurisdiction under 28 U.S.C. § 1292(a)(1) to review the issuance of that injunction. We reverse.
 
 
 112
 The Anti-Injunction Act, the predecessor of which was enacted in 1793, has long been an important and integral part of our federal system. As amended in 1948, it now provides:
 
 
 113
 A court of the United States may not grant an injunction to stay proceedings in a State court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments.
 
 
 114
 28 U.S.C. § 2283. The Supreme Court has on many occasions explicitly declared that this statute must be given a strict construction due to the sensitive nature of federal interference with state court proceedings.
 
 
 115
 On its face the present Act is an absolute prohibition against enjoining state court proceedings, unless the injunction falls within one of three specifically defined exceptions. The respondents here have intimated that the Act only establishes a "principle of comity," not a binding rule on the power of the federal courts. The argument implies that in certain circumstances a federal court may enjoin state court proceedings even if that action cannot be justified by any of the three exceptions. We cannot accept any such contention. . . . (We) hold that any injunction against state court proceedings otherwise proper under general equitable principles must be based on one of the specific statutory exceptions to § 2283 if it is to be upheld. . . .
 
 
 116
 Mitchum v. Foster, 407 U.S. 225, 229, 92 S.Ct. 2151, 2155, 32 L.Ed.2d 705 (1972), Quoting Atlantic Coast Line R. Co. v. Brotherhood of Locomotive Engineers, 398 U.S. 281, 286-87, 90 S.Ct. 1739, 26 L.Ed.2d 234 (1970). See also Amalgamated Clothing Workers v. Richman Bros., 348 U.S. 511, 75 S.Ct. 452, 99 L.Ed. 600 (1955); Carter v. Ogden Corp., 524 F.2d 74, 76 (5th Cir. 1975); International Ass'n of Machinists & Aerospace Workers v. Nix, 512 F.2d 125, 129 (5th Cir. 1975).
 
 
 117
 Furthermore, it has long been "settled that the prohibition of § 2283 cannot be evaded by addressing the order to the parties or prohibiting utilization of the results of a completed state proceeding." Atlantic Coast Line R. Co., supra, 398 U.S. at 287, 90 S.Ct. at 1743, Citing Oklahoma Packing Co. v. Gas Co., 309 U.S. 4, 9, 60 S.Ct. 215, 84 L.Ed. 537 (1940), and Hill v. Martin, 296 U.S. 393, 403, 56 S.Ct. 278, 80 L.Ed. 293 (1935). In Hill, Justice Brandeis wrote as follows for a unanimous court:
 
 
 118
 The prohibition of (§ 2283) is against a stay of "proceedings in any court of a State." That term is comprehensive. It includes all steps taken or which may be taken in the state court or by its officers from the institution to the close of the final process. It applies to appellate as well as to original proceedings; and is independent of the doctrine of Res judicata. It applies alike to action by the court and by its ministerial officers; applies not only to an execution issued on a judgment, but to any proceeding supplemental or ancillary taken with a view to making the suit or judgment effective. The prohibition is applicable whether such supplementary or ancillary proceeding is taken in the court which rendered the judgment or in some other. And it governs a privy to the state court proceeding . . . as well as the parties of record. Thus, the prohibition applies whatever the nature of the proceedings . . ..
 
 
 119
 296 U.S. at 403, 56 S.Ct. at 282-283 (footnotes omitted). Although the plaintiffs make a feeble attempt to argue that the injunction did not stay "proceedings in a State court", Hill leaves absolutely no doubt that the scheduled payment of $500,000 to the trustee of an express trust set up by a judgment of the California Superior Court was, at the least, a "proceeding supplemental or ancillary taken with a view to making the suit or judgment effective." Therefore, we cannot accept this argument and proceed to determine whether the injunction can be justified by any of the three express exceptions.[27]
 
 A. The "expressly authorized" exception
 
 120
 The plaintiffs first argue that the injunction was "expressly authorized" by Fed.R.Civ.P. 23(d), and claim that the rule cannot insure the fair and efficient conduct of class actions unless injunctions are permitted against state court proceedings by absent class members. The trouble is that this argument was never presented to the District Court and there is no real reason to suppose that it formed the unexpressed rationale for its decision. Moreover, this Court has never held that Rule 23(d) is an express exception to 28 U.S.C. § 2283, and we cannot accept that theory today. As stated in Mitchum v. Foster, 407 U.S. 225, 238, 92 S.Ct. 2151, 2160, 32 L.Ed.2d 705 (1972), "The test . . . is whether an act of Congress, clearly creating a federal right or remedy enforceable in a federal court of equity, could be given its intended scope only by the stay of a state court proceeding." Rule 23(d) is a rule of procedure and it creates neither a right nor a remedy enforceable in a federal court of equity. Thus, even under the expansive Mitchum test, which may not be quite as expansive as it seems,[28] this argument must fail.
 
 
 121
 Next, the plaintiffs claim that the injunction was authorized by 42 U.S.C. § 1983, which the Supreme Court held in Mitchum to be one of the "expressly authorized" exceptions to § 2283. Section 1983 speaks in terms of "the deprivation of any rights, privileges, or immunities secured by the Constitution and laws," and if it were construed to mean All federal laws, then the exception would quickly swallow the rule set forth in § 2283. Cf. Chapman v. Houston Welfare Rights Organization, 441 U.S. 600, 99 S.Ct. 1905, 60 L.Ed.2d 508 (1979) (Powell, J., concurring, asserting that the word "laws" in § 1983 should be interpreted to mean laws providing for equal rights). This was not the result intended by the Supreme Court in Mitchum, as is evidenced by its direct progeny, E. g., Juidice v. Vail, 430 U.S. 327, 97 S.Ct. 1211, 51 L.Ed.2d 376 (1977); Huffman v. Pursue, Ltd., 420 U.S. 592, 95 S.Ct. 1200, 43 L.Ed.2d 482 (1975); as well as the case of Vendo Co. v. Lektro-Vend Corp., 433 U.S. 623, 97 S.Ct. 2881, 53 L.Ed.2d 1009 (1977).
 
 
 122
 In this case the plaintiffs allege that they have been deprived of two separate constitutional rights. First, they argue that they were somehow deprived of property without due process of law because they never received notice of the California proceedings. Those proceedings were instituted by the California attorney general on behalf of California residents against a California corporation alleging violations of California law. As to themselves, non-Californians were not bound by that judgment, and it cannot be thought that the Constitution required the attorney general to notify residents of other states of the institution of his lawsuit. The fact that Californians ultimately won a judgment against Bestline and began to recover has not deprived the plaintiff class of property without notice.
 
 
 123
 Second, the plaintiffs argue that they have been denied the equal protection of the laws because the California restitution fund denied participation solely on the basis of residence. This argument is meritless, if not frivolous. In the first place, the Modified Judgment allows anyone with a judgment to participate in the restitution fund, and it does not differentiate on the basis of residence. Next, even if the judgment allowed no persons outside California to participate, which it does not, there is no showing that this involved suspect classes, or fundamental interests or that it would be an arbitrary or irrational distinction; hence there could be no equal protection violation.
 
 
 124
 Although the plaintiffs have not articulated their arguments well, they could be advancing an assertion that Section 27 of the Securities Exchange Act, 15 U.S.C., Section 78aa, when coupled with the authority to issue injunctions and writs of mandamus contained in Section 21 of the Act, 15 U.S.C., Section 78u, constitutes an "expressly authorized" exception to Section 2283. The Second Circuit rejected a similar contention in International Controls Corporation v. Vesco, 490 F.2d 1334, 1349 (2d Cir., 1974); and we think that decision, at least insofar as it affects private lawsuits, compare SEC v. Wencke, 577 F.2d 619 (9th Cir., 1978), is eminently correct.
 
 
 125
 There can be no doubt of this conclusion after the decision of the Supreme Court in Vendo Co. v. Lektro-Vend Corp., 433 U.S. 623, 97 S.Ct. 2881, 53 L.Ed.2d 1009 (1977). In that case, three Justices concluded that § 16 of the Clayton Act, 15 U.S.C. § 26, did not constitute an express exception to the Anti-Injunction Act. Those three Justices concluded that the Mitchum decision, which held that 42 U.S.C. § 1983 was an express exception to the Anti-Injunction Act, was based upon a "recognition that one of the clear congressional concerns underlying the enactment of § 1983 was the possibility that state courts, as well as other branches of state government, might be used as instruments to deny citizens their rights under the Federal Constitution." 433 U.S. at 633, 97 S.Ct. at 2888. They were unable to find such concerns in either the clear language or the legislative history of the antitrust laws and therefore concluded that § 16 of the Clayton Act was not such an exception. Two concurring Justices would have held "that no injunction may issue against currently pending state-court proceedings unless those proceedings are themselves part of a 'pattern of baseless, repetitive claims' that are being used as an anticompetitive device, all the traditional prerequisites for equitable relief are satisfied, and the only way to give the antitrust laws their intended scope is by staying the state proceedings." 433 U.S. at 644, 97 S.Ct. at 2894 (Blackmun, J., concurring). We are unable to find any Congressional concern in the language of the Securities Exchange Act that state courts might be used to deny individuals their rights under the Act, nor have we been pointed to any convincing legislative history to that effect. Nor can we ascertain any manner in which state court proceedings could be used to defeat the goals of the Securities Exchange Act. The California litigation was based upon violations of the state's deceptive advertising and unfair competition laws, which arguably are congruent in purpose with the Exchange Act and most assuredly do not defeat the purposes of that Act. Finally, the fact that 15 U.S.C. § 78u is concerned entirely with the authority of the SEC to seek injunctions or other equitable relief strongly militates against any contention that it expressly authorizes a federal court to enjoin state court proceedings at the behest of private parties. Therefore, we conclude that for private lawsuits the Securities Exchange Act does not constitute an "expressly authorized" exception to 28 U.S.C. § 2283. See Vendo Co., supra, 433 U.S. at 635-39 & n. 7, 97 S.Ct. 2881.
 
 
 126
 B. The "in aid of its jurisdiction" exception
 
 
 127
 The last argument advanced by the plaintiffs is that the District Court acted to protect its exclusive jurisdiction to adjudicate controversies arising under the Securities Exchange Act of 1934. See 15 U.S.C. § 78aa. In Carter v. Ogden Corp., 524 F.2d 74 (5th Cir. 1975), we considered and rejected a similar claim. In that case, Carter filed a suit in a Louisiana federal court alleging antitrust violations and a state law breach of contract claim. Ogden then filed suit in Delaware state court, and the Louisiana federal court enjoined Ogden from prosecuting any other suit. We reversed, noting that "(t)he phrase 'where necessary in aid of its jurisdiction,' . . . should be interpreted narrowly, in the direction of federal non-interference with orderly state proceedings." 524 F.2d at 76, Quoting T. Smith & Sons, Inc. v. Williams, 275 F.2d 397, 407 (5th Cir. 1960). Finding no evidence that the Delaware proceedings would interfere with the jurisdiction of the Louisiana court to hear the case, we held that the grant of exclusive jurisdiction to federal courts to entertain antitrust actions had no impact on state law breach of contract claims.
 
 
 128
 In this case the plaintiffs have alleged violations of state law, the Securities Act of 1933, and the Securities Exchange Act of 1934. The federal courts have jurisdiction to entertain the state law claims only if diversity of citizenship is present or under the doctrine of pendent jurisdiction. The state and federal courts have concurrent jurisdiction to decide cases arising under the Securities Act of 1933, and no case originally brought in a state court of competent jurisdiction under that Act may be removed to a federal court. 15 U.S.C. § 77v. Under the Securities Exchange Act of 1934, the federal district courts have exclusive jurisdiction to decide cases arising under that act. 15 U.S.C. § 78aa. Thus, in this case, the plaintiffs' argument seems to include the proposition that if they are correct in their assertion that the "in aid of its jurisdiction" exception applies because of the Exchange Act, then the District Court may enjoin state court prosecutions of either state law claims or of Securities Act claims, simply because such claims have been attached to a complaint alleging violations of the Exchange Act.
 
 
 129
 The California litigation was based solely upon violations of state law, and it never purported to adjudicate a claim under the Exchange Act. Those proceedings in no way affected the "flexibility and authority" of the federal court to decide the Exchange Act claims. See Atlantic Coast Line R. Co., supra, 398 U.S. at 295, 90 S.Ct. 1739. The fact that Bestline might have fewer assets available to satisfy any judgment entered as a result of the Florida federal litigation in no way affects the jurisdiction of the federal court. Just as we rejected in Williams, supra, the claim that a federal district court may enjoin state court proceedings simply because it has before it a case arising under the antitrust laws, we reject the argument that a federal court may enjoin state court proceedings in order to decide a private lawsuit brought under the Securities Exchange Act of 1934.
 
 SUMMARY
 
 130
 We summarize our holdings in this case, as follows:
 
 
 131
 1. Summary judgment should not have been entered.
 
 
 132
 2. Sylva was entitled to intervention as a matter of right.
 
 
 133
 3. The attorneys' fees as proposed in the Bestline settlement should not have been approved as presented.
 
 
 134
 4. The entry of an injunction against enforcement of the judgment of the California Superior Court is reversed.
 
 
 135
 5. The order entering final judgment as to Bestline and 27 individual defendants is vacated.
 
 CONCLUSION
 
 136
 The Judgment of the District Court is reversed. The case is remanded for further proceedings not inconsistent herewith.
 
 
 137
 REVERSED and REMANDED.
 
 
 138
 APPENDIX
 --------
 Chronology of Events in Bestline Litigation
 -------------------------------------------
July 22, 1970 FTC issues complaint againgst Bestline.
May 12, 1971 California files suit Bestline.
Nov. 3, 1971 Consent order with FTC becomes
 final.
Oct. 25, 1972 Trial begins in Cal.Superior Court.
June 13, 1973 Trial ends.
July 20, 1973 Piambino plaintiffs file class action
 in So. Dist. Florida.
July 23, 1973 Bestline files bankruptcy petition in
 N.D. California.
July 25, 1973 Cal. Superior Court issues written
 judgment and order, later stayed by
 N.D. California.
Dec. 21, 1973 Modified Judgment entered and
 Bestline withdraws bankruptcy petition.
Jan. 31, 1974 First payment made from restitution
 fund ($1,000,000).
May 3, 1974 Multidistrict panel first transfers
 cases to S.D. Florida.
June 30, 1974 Second payment made from
 restitution fund ($1,000,000).
Sept. 20, 1974 Lead counsel threaten Bank of
 America.
Oct. 8, 1974 Lead counsel threaten Bank of
 America.
Nov. 14, 1974 Cal. Superior Court orders payments
 to be made.
Nov. 15, 1974 Lead counsel file class action in N.D.
 California to enjoin payments.
Nov. 22, 1974 S.D. Florida certifies class.
Dec. 20, 1974 Multidistrict panel conditionally
 transfers N.D. California suit to S.D.
 Florida
Jan. 1, 1975 Third payment made from restitution
 fund ($1,000,000).
Feb. 14, 1975 Multidistrict panel vacates previous
 order. Case returns to N.D.
 California.
March 28, 1975 Hearing held in N.D. California;
 plaintiffs fail to appear.
April 4, 1975 N.D. California dismisses complaint
 with prejudice.
June 30, 1975 Fourth payment made from
 restitution fund ($1,000,000).
Jan. 1, 1976 Fifth payment made from restitution
 fund ($250,000).
Feb. 23, 1976 Ninth Circuit dismisses appeal.
March 19, 1976 S.D. Florida grants motion for
 summary judgment.
April 2, 1976 N.D. California holds that Bestline
 has violated consent order.
June 30, 1976 S.D. Florida enjoins Bestline from
 bench; written order follows on July 7.
July 19, 1976 N.D. California enters judgment
 against Bailey.
Oct. 20, 1976 S.D. Florida approves Bailey
 settlement; money then transferred from
 N.D. California to S.D. Florida.
Feb. 25, 1977 S.D. FLorida approves Bestline
 settlement and denies intervention.
 
 
 
 [1]
 Bestline Products, Inc., is a California corporation wholly owned by Bestline Corporation, another California corporation. In this opinion these corporations will be collectively referred to as "Bestline"
 
 
 [2]
 For a detailed analysis of such schemes, see Note, Pyramid Schemes: Dare to be Regulated, 61 Geo.L.J. 1257 (1973)
 
 
 [3]
 In 1974 the Judicial Panel on Multidistrict Litigation transferred six cases to the Southern District of Florida for consolidation with the case of Piambino v. Bailey, No. 73-1230-Civ. In re Bestline Products Securities and Antitrust Litigation, 375 F.Supp. 926 (Jud.Pan.Mult.Lit.1974). Later, it transferred four Texas cases to the Florida court, 405 F.Supp. 313 (Jud.Pan.Mult.Lit.1975), as well as one North Carolina case. Most of these cases were class actions and alleged violations of the federal securities laws and various state laws
 
 
 [4]
 In No. 76-3495, on August 6, 1976, the defendants filed notice of appeal from three different orders of the District Court: (1) the Order Determining Motions for Summary Judgment, dated March 19, 1976; (2) the Preliminary Injunction, dated July 7, 1976; and (3) the Order Allowing Reimbursement of Costs and Disbursements of James H. Joseph, dated July 15, 1976. The appellants filed their opening brief in December 1976, and the State of California filed an amicus brief in January 1977. The parties then began settlement negotiations and moved this Court for a stay of the appeal proceedings, which motion was granted
 Although the settlement which was finally approved by the District Court included a requirement that the defendants dismiss their appeal in No. 76-3495, they refused to do so when David Sylva appealed from the denial of his motion to intervene and from the order approving the settlement. The latter appeal was docketed as No. 77-2045, and the two appeals were consolidated for oral argument. In January 1979 the plaintiffs filed their opening brief in No. 76-3495.
 
 
 [5]
 Most of the discussion under this heading is taken from the District Court's Opinion and Order Determining Motions from Summary Judgment. See In re Bestline Products Securities, 412 F.Supp. 732 (S.D.Fla.1976)
 
 
 [6]
 Although Local Distributors could recruit other Local Distributors to sell for them, the profits achieved by a Local Distributor turned solely upon sales to the consuming public. Bestline paid no commissions or bonuses to persons at the lowest level. Consequently, no party to these suits has alleged that this aspect of the scheme violated the federal securities laws. As certified by the District Court, the class did not include any Local Distributors
 
 
 [7]
 Unless, of course, it was the expectation that one would eventually move up to the position of General Distributor and then be in a position to recruit other Direct Distributors, who might eventually pay the release fee in order to move themselves up in the hierarchy
 
 
 [8]
 Bestline's Opportunity Meetings differed little from the meetings which have been integral parts of other pyramid sales schemes. Compare SEC v. Koscot Interplanetary, Inc., 497 F.2d 473, 476 (5th Cir. 1974); SEC v. Glenn W. Turner Enterprises, Inc., 348 F.Supp. 766, 770-71 (D.Ore.1972), Aff'd, 474 F.2d 476 (9th Cir. 1973), Cert. denied, 414 U.S. 821, 94 S.Ct. 117, 38 L.Ed.2d 53 (1973); See generally Note, Pryamid Schemes: Dare to be Regulated, 61 Geo.L.J. 1257, 1259 (1973)
 
 
 [9]
 According to the district court's opinion, prior to 1970 a Direct Distributor could qualify as a General Distributor by (1) recruiting a new prepurchase Direct Distributor to replace him in his sponsoring General Distributor's organization; and (2) paying a $2,750 release fee to Bestline, $2,250 of which was then paid by Bestline to the ascending distributor's former sponsoring General Distributor, and $500 of which was retained by Bestline. Beginning in 1970, however, a Direct Distributor could become a General Distributor only by (1) recruiting a Direct Distributor to replace himself in his sponsoring General Distributor's organization; (2) paying a $600 (later $700) fee to Bestline for attendance at "General Distributor's School"; and (3) generating, either through retail or "wholesale" sales volume (the latter category including the initial "pre-purchase" sales to newly recruited pre-purchase Direct Distributors), $5000 of "product movement" in a single month
 
 
 [10]
 The pertinent provisions of that consent decree can be found in United States v. Bestline Products Corp., 412 F.Supp. 754, 760-61 n. 2 (N.D.Cal.1976)
 
 
 [11]
 Specifically, California alleged violations of California Business and Professions Code § 17500 (deceptive advertising) and Civil Code § 3369 (unfair competition). Earlier, on January 14, 1971, Bestline had signed a consent decree with the State and had agreed to cease and desist from employing certain marketing and advertising practices
 
 
 [12]
 The District Judge appointed as lead counsel for the consolidated proceedings the two attorneys, Carl H. Hoffman and James H. Joseph, who had filed the class action lawsuit on behalf of the Piambino plaintiffs in the Southern District of Florida. These two attorneys have acted as lead counsel throughout the litigation
 
 
 [13]
 Of this total, approximately 2300 resided at one time or another in California. Except for four people whom Bestline had authorized to participate in the fund, all of the other participating members joined the fund pursuant to judgments or settlements secured by six different state attorneys general or, in the case of New York City, by a Consumer Protection Bureau
 
 
 [14]
 After the District Court enjoined Bestline, it missed six payments to the restitution fund:
 Date Amount
 ---- ------
June 30, 1976 the greater of $500,000 or 50% of
 pre-tax profits
Jan. 1, 1977 $500,000
June 30, 1977 the greater of $750,000 or 50% of
 pre-tax profits
Jan 1, 1978 $750,000
June 30, 1978 the greater of $1,000,000 or 50%
 of pre-tax profits
Jan. 1, 1979 $1,000,000
 
 
 [15]
 In the Northern District of California, Judge Renfrew's extensive opinion does not mention any contribution by Lead Counsel to the FTC case. See United States v. Bestline Products Corp., 412 F.Supp. 754. In the Southern District of Florida no written findings of fact were issued in support of the conclusion that lead counsel had made a substantial contribution in the FTC case
 
 
 [16]
 Section 2(1) of the Securities Act of 1933, 15 U.S.C. § 77b(1), provides as follows:
 (1) The term "security" means any note, stock, treasury stock, bond, debenture, evidence of indebtedness, certificate of interest or participation in any profit-sharing agreement, collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting-trust certificate, certificate of deposit for a security, fractional undivided interest in oil, gas, or other mineral rights, or, in general, any interest or instrument commonly known as a "security", or any certificate of interest or participation in, temporary or interim certificate for, receipt for, guarantee of, or warrant or right to subscribe to or purchase, any of the foregoing.
 
 
 [17]
 The definition of a "security" in § 3(a)(10) of the Securities Exchange Act of 1934, 15 U.S.C. § 78c(a)(10), is substantially identical to that contained in the Securities Act, and the coverage of the Acts may be regarded as the same. International Brotherhood of Teamsters v. Daniel, 439 U.S. 551, 99 S.Ct. 790, 795 n. 7, 58 L.Ed.2d 808
 The question of whether the direct distributorships were "investment contracts" concerned the District Court. See In re Bestline Products Securities, 412 F.Supp. 732 (S.D.Fla.1976). In this Court, there is no contention that the phrases "certificate of interest or participation in any profit-sharing agreement" or "any interest or instrument commonly known as a 'security' " are broader in scope, for purposes of this case, than the term "investment contract".
 
 
 [18]
 See, also SEC v. Sloan, 436 U.S. 103, 98 S.Ct. 1702, 56 L.Ed.2d 148 (1978); Santa Fe Industries, Inc. v. Green, 430 U.S. 462, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977); Piper v. Chris-Craft Industries, Inc., 430 U.S. 1, 97 S.Ct. 926, 51 L.Ed.2d 124 (1977); TSC Industries, Inc. v. Northway, Inc., 426 U.S. 438, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976); Ernst and Ernst v. Hochfelder, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976); Foremost-McKesson, Inc. v. Provident Securities Co., 423 U.S. 232, 96 S.Ct. 508, 46 L.Ed.2d 464 (1976); Rondeau v. Mosinee Paper Corp., 422 U.S. 49, 95 S.Ct. 2069, 45 L.Ed.2d 12 (1975); Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975); Securities Investor Protection Corp. v. Barbour, 421 U.S. 412, 95 S.Ct. 1733, 44 L.Ed.2d 263 (1975); See generally Lowenfels, Recent Supreme Court Decisions Under the Federal Securities Laws: The Pendulum Swings, 65 Geo.L.J. 891 (1977)
 The District Court in this case had the benefit of the Forman decision before granting summary judgment on the security issue, but it seems not to have grasped the significance of that case. According to the District Court, the language quoted in the text meant that the Supreme Court had restated the Howey test. "By focusing on the Quality of the efforts of others, the Supreme Court read the word 'solely' out of the Howey test, it having become so much surplusage, thereby according to its prior Howey decision the flexibility originally intended." 412 F.Supp. at 737-38. The District Court failed to deal with the remainder of the Forman decision, however.
 
 
 [19]
 The essential vice of chain or pyramid distribution schemes has been well documented. For example, if the founder recruited five distributors in the first month and if those five each recruited five more distributors in month two, and if each of these subsequent recruits enticed five people to join in the month following his own recruitment, over 244 million new distributors would be recruited in the twelfth month. Obviously, this would be impossible in a nation of only 220 million people. Equally as obvious is the fact that those who have the greatest risk of loss are those who enter the pyramid when the market is closest to saturation. This seems largely an element of chance, and it is just such a realization that has prompted courts all over the country to declare such schemes to be prohibited lotteries. See generally Annot., 54 A.L.R.3d 217, 227-31. The disclosure which would be necessary to inform a new investor of his prospects for success or failure would have to change almost daily in order to reflect the acquisition of new distributors. Needless to say, there would be substantial administrative obstacles connected with any such regime of disclosure
 
 
 [20]
 In a footnote, the Court also noted the Ninth Circuit decision in SEC v. Glenn W. Turner Enterprises, Inc., supra. The Court stated that the "solely from the efforts of others" part of the Howey test was not presented in Forman and that it expressed no opinion on the Ninth Circuit's holding. 421 U.S. at 852 n. 16, 95 S.Ct. at 2060 n. 16
 
 
 [21]
 Because we have concluded that Sylva's position as Compliance Officer was an interest sufficient to warrant intervention of right, we have no occasion to address the separate question of whether his appointment as receiver of Bestline's California properties by the Superior Court on February 14, 1977, was sufficient to warrant intervention of right. The record on appeal is insufficiently developed on this point and reveals only that the California Court had appointed him and issued instructions to take possession of the assets, liquidate them, and transfer the proceeds to the restitution fund for ultimate distribution to its participants. The briefs of the parties have informed us that Sylva has carried out those duties, and, if that is indeed the case, his interest in these proceedings by virtue of his appointment as receiver might well be moot. We, of course, express no opinion on any of these points
 
 
 [22]
 As finally modified on October 21, 1976, the class included
 all persons who purchased or invested in Direct Distributorship contracts or agreements, or their equivalents, offered by Bestline Products, Inc., who never qualified as General Distributors of Bestline Products, Inc., or their equivalents, and who are not active distributors as evidenced by current renewal of their mailing list privileges.
 
 
 [23]
 Sylva outlined the position of the Superior Court as follows in his deposition:
 Q. Concerning your discussions with Bestline about the appeal, you indicated that you had monthly hearings before Judge Hupp and there was discussions at that time. Can you give me a little bit more detail about the discussions, what was indicated about Bestline pursuing the appeal?
 A. (Compliance Officer) Only that okay, to give you some background, upon the five thousand (sic) being paid over to the Florida Court, California Attorney General's Office took that as being a breach of the agreement between Bestline and the Attorney General's Office, and immediately sought to enforce its judgment, have a receiver appointed.
 At the same time, as we understand it, there were motions in Florida for the appointment of receivers. Judge Hupp did not want this thing to deteriorate into a race to the courthouse to determine which group of people obtained the judgment, and got the most money. He rather would have liked to have seen some sort of a cooperative effort in resolving the whole matter, making sure all of the people, including the Florida people, received at least partial restitution of the funds that they had been bilked out of.
 In light of this appeal (of) Judge Hupp, he was advised that the court ordered the judgment of the Florida Court was being appealed, and that the appeal was progressing nicely and that the briefs were being filed or had been filed, you know, each month and there would be a progress report by Mr. Pitto and Mr. Humphreys (attorneys for Bestline). Those were thoughts in mind but in the meantime the California Attorney General's Office is champing at the bit to close down Bestline. They are taking a very aggressive posture on behalf of, I guess, the citizens of California and all the other attorney generals who agreed with their posture.
 It was in light of these discussions that the trial court, the California Superior Court, would not rule on the motions of the Attorney General to shut everything down. It just preservation of the status quo, let's not get excited here, things are going to work out, was in light of those remarks of the judge and reports by Bestline's attorneys that the thing continued to rock along from July up until February.
 Q. So that the Attorney General put off the proceeding on his receivership motion, and the court put off ruling on those motions, and you put off taking any action in Florida on the basis that Bestline was appealing this specific seizure of the half a million dollars?
 A. Yes, that's correct . . . (A. 758-760).
 
 
 [24]
 Sylva's three witnesses testified that they had difficulty understanding the notice and that they did not need to file the proof of claim form since they had previously filed in California
 "Q. (Ms. Greer) Did you take any steps to file a Proof of Claim Form?
 A. (Norman Feinberg) No.
 Q. Why didn't you file a Proof of Claim form after trying to read that, the Notice?
 A. Well, I thought I didn't have to.
 Q. Why did you think you didn't have to?
 A. Because I already had. There was a contract entered between New York City and Bestline. And then I subsequently asked three lawyers, which (sic) said 'I don't know how an agreement entered by a court could be nullified, so that agreement would have to stand.' Now, I thought I would suffer if I would subscribe to this." (A. 808).
 "Q. (Ms. Greer) So the fact that you had already filed a claim in California, you had been notified you didn't have to participate, that convinced you not to file in Miami?
 A. (Valentin Dominguez) I thought I didn't have to.
 Q. Did you speak to any other Bestline distributors concerning the Notice?
 A. Yes, I did; a couple distributors. And in fact one of them was from California, and he was in the same I don't even know the name of the fellow. He happened to ask me that I was a distributor because he saw some of the products that I was using; and he was from California. And as I understand it, he didn't participate in the Class neither.
 Q. Do you have any personal knowledge of why he didn't participate?
 A. We discussed the situation. And he says, 'Well, we don't have to. We covered from California.' " (A. 816-817).
 "Q. (By Ms. Greer) Mr. Dominguez, is it correct that the reason you did not file here in Florida is because you had already filed a claim in California?
 A. Right. And they have all the records that I have, plus the fact that the form that I got from Florida requires me to file an inventory and an amount of money that I invested in Bestline. I didn't have anything like that because it was sent to California.
 Q. Then you sent all of your documents and supporting information to California when you filed your claim there?
 A. To California, right." (A. 818).
 "Q. (By Ms. Greer) Please tell the Court what you did when you received the Notice.
 A. (By Susie Rosenrot) When I received the letter, you know, I answer saying I don't see any I have to make another claim because I already did it." (A. 822).
 "Q. (By Ms. Greer) Mrs. Rosenrot, what steps did you take to try to get information about the Notice? What did you do to try to get information?
 A. I wrote the letter to Mr. Dan Sylva saying that I did not see why I have to do it all over again because I already filed it so I could not understand it.
 Q. Did you read the Notice?
 A. I read it but I could not understand too much, you know. I don't know why I had to do that." (A. 823).
 "Q. (By Ms. Greer) Did you file a Proof of Claim form here in Florida?
 A. No.
 Q. Other than writing that letter?
 A. That's right.
 Q. You wrote that letter for more information?
 A. That's all.
 Q. Do you have the documents for your claim or did you send them to California?
 A I sent everything to California when I made the claim.
 Q. So that the California Fund has all of your documents and the claim form?
 A. That's right." (A. 825-826).
 
 
 [25]
 If this were simply a case of defining the zone of acceptable settlements, we would look to the standards set forth by the Supreme Court in a bankruptcy approval case, Protective Committee v. Anderson, 390 U.S. 414, 424-25, 88 S.Ct. 1157, 20 L.Ed.2d 1 (1968). Those criteria would be especially applicable in this case because the assets of the corporation were so likely to be liquidated. See also Cotton v. Hinton, 5 Cir. 1977, 559 F.2d 1326; Miller v. Republic National Life Ins. Co., 5 Cir. 1977, 559 F.2d 426, 429; Developments in the Law Class Actions, 89 Harv.L.Rev. 1318, 1573-75 (1976)
 
 
 [26]
 The February 10, 1977, Notice of Proposed Partial Settlement of Litigation contains some interesting statistics concerning the composition of the class which was certified. Notice was originally mailed to approximately 34,000 potential plaintiffs. 3,744 of these elected to exclude themselves from the litigation, and 8,779 of the notices were returned as undeliverable. Of the remaining class members, 4,332 completed and returned a proof of claim form. Apparently, the District Judge intended to distribute the settlement proceeds only to those 4,332 people. The record on appeal does not indicate how many of the California group excluded themselves from the litigation or how many filed proof of claim forms in Florida
 
 
 [27]
 We do not consider the "protect or effectuate its judgments" exception for the simple reason that there was no judgment to protect when the injunction issued. See Mitchum v. Foster, 407 U.S. 225, 236 & n. 21, 92 S.Ct. 2151, 32 L.Ed.2d 705 (1972); International Ass'n of Machinists & Aerospace Workers v. Nix, 5 Cir. 1975, 512 F.2d 125, 129-33 (recognizing the federal court under this exception may enjoin "the relitigation in state court of issues that federal courts have fully and finally adjudicated")
 
 
 [28]
 See, e. g., Juidice v. Vail, 430 U.S. 327, 341-47, 97 S.Ct. 1211, 51 L.Ed.2d 376 (1977) (Brennan, J., dissenting); Huffman v. Pursue, Ltd., 420 U.S. 592, 613-18, 95 S.Ct. 1200, 43 L.Ed.2d 482 (1975)