**Gene E. PHILLIPS, et al., Plaintiffs-Appellees,**

**v.**

**Alan C. KAPLUS and the Johnson Collection, Inc., Defendants-Appellants.**

**No. 84–5316.**

United States Court of Appeals, Eleventh Circuit.

July 2, 1985.

---

Lapidus & Stettin, P.A., Richard L. Lapidus, Robert P. Frankel, Miami, Fla., for defendants-appellants.

Carlton, Fields, Ward, Emmanuel, Smith & Cutler, P.A., Edward I. Cutler, Tampa, Fla., Carlton, Fields, Ward, Emmanuel, Smith & Cutler, P.A., Tallahassee, Fla., for plaintiffs-appellees.

Before RONEY, and TJOFLAT, Circuit Judges, and BROWN *, Senior Circuit Judge.

---

* Honorable John R. Brown, U.S. Circuit Judge for the Fifth Circuit, sitting by designation.

1. The plaintiff group also involved several corporations which had been formed by Phillips and Kaplus.

JOHN R. BROWN, Circuit Judge:

The case before us involves a dispute between joint venture partners: Alan C. Kaplus, defendant-appellant, and Gene E. Phillips, et al., plaintiffs-appellees. The suit arose as a result of alleged fraud and misrepresentations on the part of Kaplus in connection with his purchase from plaintiffs of their interest in a joint venture partnership for development of real estate. The court below determined that Kaplus had defrauded his partners in purchasing their interest. The court also awarded plaintiffs attorneys fees under the Florida Securities Act. The questions presented for our review are whether the district court correctly tried the case without a jury, and whether the district court correctly held that defendants' failure to disclose material facts to plaintiffs in connection with the transaction in issue constituted fraud in connection with the purchase or sale of a security under federal or Florida state securities law.

For the reasons stated below, we affirm the district court's denial of a jury trial. However, we believe that the transactions in question did not involve a security; therefore, we reverse that portion of the district court's decision awarding plaintiffs' attorneys' fees under the Florida state securities laws, F.S. § 517.211(6).

### I. Facts

The individual plaintiffs in this diversity action, Gene E. Phillips and William S. Friedman,[1] formed a corporation called Syntek of Florida, Inc. (Syntek). In 1980, the individual plaintiffs, Syntek, and defendant, Alan C. Kaplus (Kaplus)[2] entered into a joint venture partnership—Biscayne Centre Associates (Biscayne). Biscayne acquired title to two blocks of land on Biscayne Boulevard in Miami, Florida, with plans to construct one or more office buildings on the property. Syntek was desig-

2. The other named defendant is a New Jersey corporation, The Johnson Collection, Inc.

nated as the managing partner, but Kaplus was in charge of overseeing the project, as well as identifying prospective tenants for the buildings.

After some investigation, Kaplus reported to his partners that the leasing prospects for the proposed building were dim, although Kaplus did mention the remote possibility of a lease with Storer Broadcasting Corp. (now Storer Communications). Plaintiffs contend, and the trial court found, that Kaplus painted a pessimistic picture regarding the prospect of a lease with Storer when, in fact, Kaplus and Storer were engaged in serious negotiations for the terms of a lease agreement, including an option to purchase on the part of Storer. Kaplus advised that, in light of the poor prospects for the planned office complex, he had located a New Jersey investor (The Johnson Collection, Inc.) which was interested in purchasing the entire project. Plaintiffs agreed to sell their interest to the New Jersey investors, ignorant of the fact that the Storer lease had virtually been finalized. Kaplus later told Phillips that the prospective purchaser (the Johnson Collection) wanted Kaplus to retain a "minority interest" in Biscayne so that he could manage the property.

The Johnson Collection, the purchaser of plaintiffs' interest, was a corporation which had been formed by a New Jersey lawyer named Larry Cole. Unknown to plaintiffs, Cole was a friend of defendant Kaplus, and had in fact agreed to use the Johnson Collection to purchase plaintiffs' interest in Biscayne, and then to transfer that interest to Kaplus.[3] In this way, Kaplus hoped to obtain full ownership of the Biscayne enterprise, without letting his partners know that he was buying them out. In early 1981, the deal was completed, and plaintiffs sold their interest in Biscayne to the Johnson Collection.

In late November of 1981, plaintiffs first became aware of the facts which had been withheld by the defendants regarding the Storer transaction and Kaplus' interest in the Johnson Collection. Plaintiffs instituted this action, which was tried before the court without a jury. The trial court held that Kaplus failed to make a full disclosure to plaintiffs of the extent of his interest in the ostensible purchaser, the Johnson Collection, thereby committing a breach of fidelity due to plaintiffs as his joint venturers. The trial court further held that Kaplus' actions constituted common law fraud, entitling plaintiffs to an order rescinding the sale of their interest in Biscayne Center Associates, and restoring their ownership interest in the joint venture partnership as they existed prior to their sale of their interests to Kaplus. The trial court further stated that upon rescission, plaintiffs are entitled to an order declaring that the joint venture be dissolved, that an accounting be conducted by the parties incidental thereto under the supervision of the Court, and that a lien be impressed upon Kaplus' interest in the joint venture or the proceeds thereof, for all of his obligations found due in the accounting.

## II. *Right to a Jury Trial*

We first consider the lower court's decision to conduct a bench trial on plaintiffs' claims. Defendants maintain that the pleadings below raised legal issues, and that the Court's trial of plaintiffs' claims denied defendants' their Seventh Amendment right to a trial by a jury. We thus examine the pleadings below, and the nature of the issues presented therein.

Counts I and II of plaintiffs' original complaint sought rescission of their sale-purchase transaction with the defendants due to violation of federal and Florida securities laws. Both counts initially asked for damages in the alternative; however, plaintiffs subsequently withdrew all claims for damages.

The prayer in Count III, based on diversity jurisdiction, originally sought injunctive relief, the declaration of a trust, and the imposition of a lien upon defendants' inter-

---

**3.** Agreements between Kaplus and Cole provided that, once the Johnson Collection had purchased plaintiffs' interest, Cole was to transfer that interest to Kaplus. However, Cole was to retain a 5% interest in the Biscayne project, leaving Kaplus with a 95% interest therein.

est in the venture. It was amended before an answer was filed to include a request for the remedy of common law rescission. Count IV, also based on diversity jurisdiction, sought dissolution of the partnership, an accounting incidental thereto, and the imposition of a lien. Plaintiffs later added a fifth count to the complaint seeking rescission under New York's securities law.

Defendants timely filed an Answer, containing affirmative defenses and counterclaims. The first two counts of defendants' counterclaim sounded in tort, seeking damages for slander and interference with Kaplus' business. The third count of the counterclaim sought damages in connection with another venture in which plaintiffs and defendants were mutually involved. The final paragraph of the counterclaim contained defendants' request for a jury trial, and read as follows:

> WHEREFORE, being injured, Counter Plaintiff, Alan Kaplus, demands compensation and punitive damages of the plaintiffs and Syntek Corporation and requests trial by jury of all issues so triable.

Kaplus later filed an Amended Counterclaim and then a Second Amended Counterclaim, dropping the third count of the original counterclaim, and adding a claim for rescission of the parties' original joint venture partnership agreement. Plaintiffs, having dropped their claims for damages, asserted that the only legal issues remaining in the case were defendants' counterclaims sounding in tort. Since these counterclaims were not directly related to the claims in plaintiffs' complaint, and since trial of the issues presented in plaintiffs' complaint would not affect the disposition of the tort claims, plaintiffs asked the Court to separate the issues, trying the equitable issues presented in their com-

plaint first without a jury, then the legal issues raised in the counterclaim before a jury. The district court granted plaintiffs' requests and informed the parties of its intention to try first the plaintiffs' claims without a jury. Subsequently, Kaplus himself dismissed the second amended counterclaim.[4] Defendants still maintain, however, that plaintiffs' claims raised legal issues entitling them to a trial by a jury in accordance with their request.

### A. Waiver

■ Plaintiffs, attempting to head defendants off at the pass, first assert that, regardless of the presence of any legal issue in the complaint, defendants failed properly to request a jury trial for those issues, as required by F.R.Civ.P. 38.[5] Plaintiffs contend that, by attaching their jury demand to the counterclaim, defendants waived their right to a jury trial on issues set out in the complaint.

On our reading of the pleadings, plaintiffs' assertion of waiver is incorrect. Kaplus' demand for a jury trial was not confined to the counterclaim; it specifically requested "trial by jury of all issues so triable." If a defendant's demand for a jury trial does not specify particular issues which the defendant wishes to be tried by a jury, such a request has the effect of demanding a jury trial of "all issues so triable." F.R.Civ.P. 38(c). Kaplus' demand for a jury trial, albeit following the counterclaim, timely satisfied Rule 38(b) demand requirements, and gave plaintiffs notice that defendant sought trial by jury on all issues so triable presented in the pleadings.

### B. Nature of the Issues

■ We turn now to defendants' contention that they were entitled to a jury trial on the issues presented in this case. The Seventh Amendment preserves the

---

4. Thus, if the trial court's decision to try plaintiffs' claims without a jury before trying defendants' legal counterclaims constituted error, it was harmless.

5. F.R.Civ.P. 38:

    **(b) Demand.** Any party may demand a trial by jury of any issue triable of right by a jury by serving upon the other parties a demand therefor in writing at any time after the commencement of the action and not later than 10 days after the service of the last pleading directed to such issue. Such demand may be indorsed upon a pleading of the party.

right to trial by jury in suits in which legal rights are to be determined in contrast to those in which equitable rights and remedies are involved. *Parsons v. Bedford,* 28 U.S. (3 Pet.) 433, 446–47, 7 L.Ed. 732 (1830). The seminal case of *Beacon Theatres v. Westover,* 359 U.S. 500, 79 S.Ct. 948, 3 L.Ed.2d 988 (1959), and its progeny recognized that a jury trial predicated on a legal cause of action is not to be defeated or impaired by a prior proceeding without a jury on other issues involved in the same case. *See also Eli Lilly Co. v. Generix Drug Sales, Inc.,* 460 F.2d 1096, 1107 (5th Cir.1972); *Swofford v. B & W, Inc.,* 336 F.2d 406 (5th Cir.1964), *cert. denied,* 379 U.S. 962, 85 S.Ct. 653, 13 L.Ed.2d 557 (1965); *Thermo-Stitch, Inc. v. Chemi-Cord Processing Corp.,* 294 F.2d 486 (5th Cir. 1961). In the present action, the defendants maintain that the remedies sought by plaintiffs, and granted by the district court —namely, rescission of plaintiffs' sale of their partnership interests, the placing of a constructive trust on all assets of the Biscayne office complex venture, and a subsequent dissolution of the partnership and an accounting incidental thereto—are legal in nature, thus entitling them to a jury trial on these issues.

### 1. *Rescission*

■ The essence of plaintiffs' complaint below was a request to rescind the transfer of their partnership interest to Kaplus, and to restore the parties to their positions as joint venturers as they existed before the fraudulent transfer took place. Defendants argue that this equitable relief is unavailable in the present case, and that therefore plaintiffs must instead pursue a legal claim for money damages, giving defendants the right to a jury trial. Defendants cite Florida law for the proposition that rescission is unavailable unless it is possible to restore the parties to the status quo existent at the time of the transfer which is sought to be rescinded. *Gentry v. Smith,* 487 F.2d 571, 578 (5th Cir.1973); *Zapetis v. Wills,* 156 So.2d 33 (Fla. 3d Dist.Ct.App.1963). Defendants then argue that, since the previous tenant, Storer Com-

munications, has exercised the option to buy the Biscayne property given to it by Kaplus, it is impossible to return the parties to the status quo at the time of plaintiffs' sale of their partnership interest in Biscayne.

At the outset, we point out that the right to a jury trial in the federal court is to be determined as a matter of federal law. *Simler v. Conner,* 372 U.S. 221, 222, 83 S.Ct. 609, 610, 9 L.Ed.2d 691 (1963); *Byrd v. Blue Ridge Rural Electric Cooperative, Inc.,* 356 U.S. 525, 538, 78 S.Ct. 893, 901, 2 L.Ed.2d 953 (1958); *Nunez v. Superior Oil Co.,* 572 F.2d 1119, 1125 (5th Cir.1978). And the federal law is clear that an action for rescission is equitable, triable by the court without a jury. *Arber v. Essex Wire Corp.,* 490 F.2d 414, 422 (6th Cir.1974), *cert. denied,* 419 U.S. 830, 95 S.Ct. 53, 42 L.Ed.2d 56 (1974); *Mallory v. Citizens Utilities Co.,* 342 F.2d 796, 797 (2d Cir. 1965); *Liberty Mutual Ins. Co. v. Gerald,* 170 F.2d 917, 919 (5th Cir.1948); *see generally* 5 Moore's Federal Practice ¶ 38.23 at 38–187, n. 1 (2d ed. 1984) (listing cases). Nevertheless, if the right to rescission itself is unavailable under state law, it must be so also in this diversity case, since "Congress never gave nor did the federal courts ever claim, the power to deny substantive rights created by state law or to create substantive rights denied by state law." *Guaranty Trust Co. of New York v. York,* 326 U.S. 99, 65 S.Ct. 1464, 89 L.Ed. 2079 (1945).

We disagree, however, with defendants' analysis under Florida law. Defendants misapprehend the nature of plaintiffs' claim. Restoring the plaintiffs to their status quo in this case means returning them to their interest in the Biscayne Center joint venture. The trial court restored the plaintiffs' interest in their partnership with Kaplus, not any ownership interest in the building on the land which that partnership had purchased. Indeed, plaintiffs affirmed Storer's purchase of the property, and expressly stated that they did not wish to interfere with Storer's ownership of that property. Instead, what they sought, and

what they received, was restoration to their position as joint venturers in the Biscayne Center Associates enterprise. In this case, the accounting ordered incident to the rescission will insure a proper return to the status quo before the transaction, and will serve to balance the equities between the parties. *O'Donnell v. Novak,* 183 So.2d 884 (Fla. 3d Dist.Ct.App.1966). We conclude, therefore that rescissionary relief was properly available to plaintiffs, and was properly tried by the court below without a jury.

## 2. *Accounting*

In Count IV of their complaint, the plaintiffs asked the court to dissolve the partnership after restoration of their interest therein, and to render an accounting as part of the dissolution. Defendants contend that irrespective of any other relief sought, they were entitled to a jury trial on the accounting issue, maintaining that in the present case, plaintiffs' request for an accounting is tantamount to a legal claim for damages.

The basic consideration for determining when the right to a jury trial exists is the historical distinction between law and equity. For those claims which traditionally were cognizable at law, the right to a jury is generally preserved; for those claims which historically were considered equitable, no jury trial is mandated. *In Re Graham,* 747 F.2d 1383 (11th Cir.1984).

As a result of the merger of law and equity in the federal courts, however, and the evolution of both legal and equitable issues, courts have at times struggled with the legal or equitable classification of particular types of claims. In light of the problems experienced by federal courts in attempting to classify various claims, the Supreme Court, in *Ross v. Bernhard,* 396 U.S. 531, 90 S.Ct. 733, 24 L.Ed.2d 729 (1970), recognized three factors that may be considered when examining whether a particular claim gives rise to a jury trial: (1) the customary manner of trying such a cause before the merger of law and equity in 1938; (2) the kind of remedy sought by the plaintiff; and (3) the abilities and limi-

tations of a jury in deciding the issue. *Ross,* 396 U.S. at 538 n. 10, 90 S.Ct. at 738 n. 10; *see also Cox v. C.H. Masland & Sons, Inc.,* 607 F.2d 138, 143 (5th Cir.1979).

Using this analysis, we conclude that the district court was clearly correct in determining that no right to a jury trial existed here. First, and most important, an accounting between partners has traditionally been considered an equitable form of action. While the accounting action grew out of the old common law action of account render, *Williams v. Collier,* 32 F.Supp. 321, 324 (E.D.Pa.1940), an action for an accounting between partners has generally been considered equitable. 5 Moore's Federal Practice, ¶ 38.25 at 38–208 (2d Ed. 1984). Indeed, it has been said that a court of equity is the only forum in which partnership affairs can be settled. 60 Am. Jur.2d Partnership § 266 (1972).

Moreover, under federal law, actions for accounting have traditionally been considered equitable. *See, e.g., Kirby v. Lake Shore & Michigan Southern Railroad Co.,* 120 U.S. 130, 7 S.Ct. 430, 30 L.Ed. 569 (1887); *Friedman v. Golden Arrow Films, Inc.,* 442 F.2d 1099 (2d Cir.1971); *Luff v. Luff,* 158 F.Supp. 311 (D.C.D.C.1958), *rev'd in part,* 267 F.2d 643 (D.C.Cir.1959); *Edward B. Marks Music v. Wonnell,* 4 F.R.D. 146 (S.D.N.Y.1944); *Taylor v. McKeever,* 1 F.R.D. 565 (E.D.N.Y.1940). Additionally, while not controlling here, we observe that Florida courts also recognize the equitable nature of an accounting. *See, e.g., Padgett v. First Federal Savings and Loan Association,* 378 So.2d 58 (Fla. 1st Dist.Ct.App. 1979); *Riggs v. Saltmarsh, Cleaveland and Gund,* 341 So.2d 818 (Fla. 1st Dist.Ct. App.1977).

With regard to the second *Ross* factor, the remedy sought, we believe a similar conclusion is warranted. In the present action, plaintiffs have requested a rescission and restoration of their partnership interest so that the partnership may be formally, properly and equitably dissolved and so that a winding up or accounting may restore to both parties all equitable sums due. Thus, this action in-

volves the settlement of partnership accounts—the type of action clearly committed to the equitable jurisdiction of the court.

Defendants' reliance on *Dairy Queen v. Wood*, 369 U.S. 469, 82 S.Ct. 894, 8 L.Ed.2d 44 (1962) is misplaced. *Dairy Queen* held that a request for a nominally equitable remedy could not be used to convert what was otherwise a legal claim into an equitable one in order to defeat the right to a jury trial. In that case, the court examined the plaintiff's request for an accounting, determined that it was really a legal claim for breach of contract, and properly rejected plaintiff's equitable characterization of the claim.

As discussed, the type of relief requested by plaintiff here necessarily involves the court's equitable jurisdiction. The fact that the ultimate disposition of the action will involve a distribution of partnership assets to all parties does not convert this into a legal action for damages. Rather, it merely is the natural consequence of the winding up of partnership affairs. This is simply not a case where the party is attempting to disguise a legal claim for damages by asking for an accounting.

As to the third factor recognized in *Ross* —the abilities and limitations of the jury— we acknowledge the timidity with which the courts have addressed this issue. While at least one circuit has suggested that mere complexity of facts alone can provide the basis for equitable jurisdiction and the denial of a jury trial, *In Re Japanese Electronic Products Antitrust Litigation*, 631 F.2d 1069 (3d Cir.1980), we have not done so, and we do not do so here.

Yet in the specific case of actions for accounting, the courts have recognized that complexity of the accounts is one of the reasons for drawing the accounting action into equitable jurisdiction. *Kirby v. Lake Shore & Michigan Southern R.R.*, 120 U.S. 130, 134, 7 S.Ct. 430, 432, 30 L.Ed. 569 (1887); *see generally* Note, Unfit for Jury Determination: Complex Civil Litigation and the Seventh Amendment Right of Trial by Jury, 20 B.C.L.Rev. 511, 525–26 (1979). In any event, to the extent that *Ross* suggests such a factor is relevant,[6] we observe that the claims and remedies involved in the instant action are certainly quite complicated, and in this regard our decision is consistent with that aspect of the *Ross* decision.

In conclusion, we are convinced that the trial court correctly determined that the issues presented below were equitable, and that therefore no jury trial was mandated. Plaintiffs' request for rescission of the sale of their partnership interest, a reformation of that partnership, and a subsequent winding up and accounting of partnership affairs all presented traditional equitable proceedings, and the district court was correct in denying a jury trial on these issues.

### III. *Application of Securities Laws*

We turn next to the trial court's award of attorneys' fees under the Florida Securities Act, F.S. § 517.211(6).[7] Plaintiffs alleged, and the trial court found, that Larry Cole, the New Jersey attorney who arranged the purchase of plaintiffs' interest, and took a 5% interest therein, was a passive investor in the partnership interest sold by plaintiffs. The Court then rea-

---

**6.** Whether or not this factor retains any vitality is indeed open to question. As the court observed in *In Re Financial Securities Litigation*, 609 F.2d 411 (9th Cir.1979), *cert. denied sub nom, Gant v. Union Bank*, 446 U.S. 929, 100 S.Ct. 1866, 64 L.Ed.2d 281 (1980) on several occasions since *Ross,* the Supreme Court has considered the Seventh Amendment question without once considering the practical abilities and limitations of juries. *Id.* at 426, n. 48, *citing Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979); *Atlas Roofing Co. v. Occup. Safety Comm'n*, 430 U.S. 442, 97 S.Ct. 1261, 51 L.Ed.2d 464 (1977); *Pernell v.*

*Southall Realty,* 416 U.S. 363, 94 S.Ct. 1723, 40 L.Ed.2d 198 (1974); *Curtis v. Loether,* 415 U.S. 189, 94 S.Ct. 1005, 39 L.Ed.2d 260 (1974); *Colgrove v. Battin*, 413 U.S. 149, 93 S.Ct. 2448, 37 L.Ed.2d 522 (1973).

**7.** F.S. 517.211(6):

In any action brought under this section, including an appeal, the court shall award reasonable attorneys' fees to the prevailing party unless the court finds that the award of such fees would be unjust.

soned that, under the line of cases beginning with *Securities and Exchange Commission v. Howey,* 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946), Cole's purchase constituted an investment contract, and was thus a security under federal and state securities laws. On this basis, the Court determined that attorneys' fees were appropriate under the Florida statute.

Under the Securities Act of 1933,[8] a "security" is defined as follows:

When used in this subchapter, unless the context otherwise requires—

(1) The term "security" means any note, stock, treasury stock, bond, debenture, evidence of indebtedness, certificate of interest or participation in any profit-sharing agreement, collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting-trust certificate, certificate of deposit for a security, fractional undivided interest in oil, gas, or other mineral rights, or, in general, any interest or instrument commonly known as a "security", or any certificate of interest or participation in, temporary or interim certificate for, receipt for, guarantee of, or warrant or right to subscribe to or purchase, any of the foregoing.

15 U.S.C.A. § 77b(1) (West 1981).

Plaintiffs contend that Cole's interest constituted an "investment contract" and was therefore a "security" as defined in the Act. Our analysis must therefore begin with the seminal case of *Securities and Exchange Commission v. Howey.* In *Howey,* the Supreme Court analyzed a scheme whereby potential investors were offered the purchase of individual rows of trees in a citrus grove development, in conjunction with a contract for the cultivation and marketing of the trees by the seller of these interests. In return, the purchasers were to receive the net profits from the harvest and marketing of the citrus fruit from the trees. The Court held that this

plan constituted an investment contract under the Act of 1933. The Court observed that the purchasers of the trees were primarily business people who lacked the skill and knowledge necessary for the care and cultivation of citrus trees. Rather, the Court determined that the trees were purchased with the hope and expectation that the sellers would successfully manage the enterprise, market the fruit, and return substantial profits to the purchasers. In holding that this was the type of transaction the Securities Act was meant to encompass, the Court defined an investment contract to be a "contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party...." 328 U.S. at 298–99, 66 S.Ct. at 1102–03.

*Howey* recognized that the Securities Acts, which were passed to correct serious abuses in the then largely unregulated securities markets, were intended to reach the "countless and variable schemes devised by those who seek the use of the money of others on the promise of profits." *Id.* at 299, 66 S.Ct. at 1103. Since *Howey,* the Supreme Court, this Court and other federal courts have reiterated that Congress intended the application of the statutes to turn not on the name by which a particular transaction is designated, but rather on the economic realities of the commercial enterprise in question. *United Housing Foundation v. Forman,* 421 U.S. 837, 95 S.Ct. 2051, 44 L.Ed.2d 621 (1975); *King v. Winkler,* 673 F.2d 342 (11th Cir. 1982); *SEC v. Professional Associates,* 731 F.2d 349 (6th Cir.1984); *United American Bank of Nashville v. Gunter,* 620 F.2d 1108 (5th Cir.1980).

In the instant case, the district court found that defendant Kaplus utilized Larry Cole and the Johnson Collection, Inc. as a means of purchasing plaintiffs' interest in the Biscayne Center Joint Venture. As part of the scheme, Cole and Kaplus

---

**8.** Since the definition of "security" under the Florida statute is the same as that under federal law, *Wiener v. Brown,* 356 So.2d 1302 (Fla. 3d Dist.Ct.App.1978), we look to federal law in reviewing the district court's decision.

agreed that once the Johnson Collection had acquired plaintiffs' interest, the Johnson Collection would transfer 95% of that interest to Kaplus. The corporation, however, was to retain 5% of the interest so acquired.

The district court then looked through the corporate form used in the transaction and determined that plaintiffs' interest in Biscayne had been purchased not by the Johnson Collection, Inc., but rather by two individuals—Cole and Kaplus. Further analyzing the relationship between these two, the Court observed that agreements between Cole and Kaplus anticipated that Kaplus would be in charge of all aspects of the management of the Florida property. Cole, as the owner of a mere 5% of the enterprise, was to have nothing to do with the day-to-day operation of the partnership. The Court concluded that Cole was a passive investor in the venture, that he intended to rely solely on the efforts of Kaplus for profits therefrom, and that Cole's interest thus constituted a security.

We observe initially that the district court's characterization of Cole's interest in the enterprise is not directly at odds with the *Howey* analysis. As discussed, the *Howey* test for an investment contract requires an investment in a common enterprise with the expectation of profits to be derived solely from the efforts of others.[9] Assuming for the moment that the requirements of a common enterprise and dependence on the managerial efforts of others

are met, we nevertheless decline to find that a security existed here. This holding is based on our belief that, whatever the relationship between Cole and Kaplus, Cole's interest simply was not an "investment" as contemplated by the Securities Act.

The record below contains no evidence that Cole's presence in the enterprise was the result of his investment of money or services with the hope of making a profit. To the contrary, the testimony of both Kaplus and Cole, elicited by adverse counsel, suggests that Cole received his 5% interest as compensation for services rendered in purchasing plaintiffs' interest. On direct examination, Kaplus discussed Cole's status in the transaction:

Q  Mr. Cole was to get some interest in the deal. Is that right?

A  Yes.

    \*    \*    \*    \*    \*    \*

Q  So Mr. Cole was to get a percentage of what the Johnson Collection would have. Is that correct? The original deal.

A  Yes.

Q  And that was for getting Mr. Horowitz [a potential investor in the enterprise] and his associates into the deal. Is that correct?

A  That is what I understood the arrangements to be.

---

9. The requirement that profits be derived "solely" from the efforts of others has proved to be a controversial aspect of the *Howey* test. In *Securities and Exchange Commission v. Glenn W. Turner Enterprises, Inc.,* 474 F.2d 476 (9th Cir. 1973), *cert. denied,* 414 U.S. 821, 94 S.Ct. 117, 38 L.Ed.2d 53 (1973), the Ninth Circuit adopted a somewhat broader test, asking simply whether the "essential managing efforts which effect the failure or success of the enterprise" are those of a third party. In *United Housing Foundation, Inc. v. Forman,* 421 U.S. 837, 95 S.Ct. 2051, 44 L.Ed.2d 621 (1975), the Supreme Court acknowledged the Ninth Circuit's test, but expressed no view as to its propriety, instead simply restating the *Howey* test. 421 U.S. at 852 n. 16, 95 S.Ct. at 2060 n. 16.

While the former Fifth Circuit appeared to adopt the *Turner* test in *Securities and Exchange*

*Comm. v. Koscot Interplanetary, Inc.,* 497 F.2d 473, 479–84 (5th Cir.1974), that court subsequently observed that the Supreme Court had "reaffirmed the test first enunciated in *Howey* ...." *Piambino v. Bailey,* 610 F.2d 1306, 1317 (5th Cir.1980), *cert. denied,* 449 U.S. 1011, 101 S.Ct. 568, 66 L.Ed.2d 469 (1980). This Court has yet to decide whether *Koscot* and the line of cases following it conflict with *Howey* and *Forman. Villeneuve v. Advanced Business Concepts,* 730 F.2d 1403, 1404 n. 2 (11th Cir.1984) (en banc). *But see Villeneuve v. Advanced Business Concepts,* 698 F.2d 1121, 1125–27 (11th Cir. 1983) (Kravitch, J., dissenting, arguing that *Koscot* requires application of the broader *Turner* test). While we acknowledge the conflict, our disposition of the case makes unnecessary any resolution of this issue.

Q After Mr. Horowitz and his associates dropped out, did Mr. Cole remain in the deal?

A Yes.

Q Why?

A Well, Larry [Cole] was a very good friend of mine and we had a situation some years ago, 1974, where an associate of [plaintiff] Mr. Phillips, but unrelated to Mr. Phillips, needed some financing for construction and Larry's father had recently passed away, and he had some money that he needed to reinvest in a like deal. To make a long story short, ... Larry's estate, father's estate, lost, I think it was about 120 thousand or something along those lines. I always said to Larry, if I ever had an opportunity to make this up to you, even though it was not my fault or Mr. Phillips' fault, I would do so. He had worked on this deal and I thought it fair to include him in this transaction in a small percentage. That is exactly the way it came down.

Q I see. You did it for past favors and also for what he had done in this deal for you?

A That's correct.

Trial Record at 106–08.

Similarly, Larry Cole's testimony reflects that his interest was not an investment, but rather compensation for his part in the transaction:

Q You were going to be a co-investor?

A I was going to receive some stock.

Q From whom were you going to get that stock?

A The transaction itself. I was taking a percentage of the deal.

Q Without putting any cash in?

A Without putting any cash?

Q It was for services.

A It was for bringing the people together, yes, sir. And in part for the work I was doing.

Trial Record at 529–30.

While we hesitate to place undue reliance on the potentially self-serving testimony of Kaplus and his colleague Cole, we are convinced that this examination by adverse counsel accurately reflects the nature of Cole's interest in the venture. Moreover, the record is devoid of compelling contrary evidence that Cole's status was truly that of an investor. We are thus unpersuaded that any "investment" took place here. The Securities Acts were passed to curb abuses in a particular type of transaction: "the sale of securities to raise capital for profit-making purposes...." *Forman*, 421 U.S. at 849, 95 S.Ct. at 2059. Such a transaction is simply not involved here. While we recognize that, as remedial statutes, the securities acts are to be broadly construed, *Tcherepnin v. Knight*, 389 U.S. 332, 336, 88 S.Ct. 548, 19 L.Ed.2d 564 (1967), they must also be construed against the background of their purpose. As broad as the definition of security may be, it was not intended to encompass a transaction such as the one in issue here.

*Conclusion*

In summary, we affirm the district court's determination that no right to a jury trial existed on the issues presented in this case. We disagree, however, with the district court's conclusion that Cole's interest in the venture constituted a security, and thus the award of attorneys' fees under F.S. 517.211(6) is reversed. As the district court's opinion reveals that an accounting and winding up of the partnership affairs has yet to take place, we remand the case for proceedings consistent with this opinion.

AFFIRMED in part, REVERSED in part, and REMANDED.