907 F.2d 1227
 285 U.S.App.D.C. 221, 12 Employee Benefits Ca 2158
 Unpublished Disposition
NOTICE: D.C. Circuit Local Rule 11(c) states that unpublished orders, judgments, and explanatory memoranda may not be cited as precedents, but counsel may refer to unpublished dispositions when the binding or preclusive effect of the disposition, rather than its quality as precedent, is relevant.
Joseph P. CONNORS, Sr., et al., Appellants,
v.
INCOAL INCORPORATED a/k/a Incoal Coal Company, et al.
 No. 89-7058.
 United States Court of Appeals, District of Columbia Circuit.
 July 20, 1990.
 
 Before STEPHEN F. WILLIAMS and Sentelle, Circuit Judges, and SPOTTSWOOD W. ROBINSON, III, Senior Circuit Judge.
 JUDGMENT
 PER CURIAM.
 
 
 1
 This case occasions no need for a published opinion. See D.C.Cir.Rule 14(c). It is
 
 
 2
 ORDERED and ADJUDGED that the decision of the district court is affirmed for the reasons set forth in the attached memorandum.
 
 
 3
 The Clerk is directed to withhold issuance of the mandate herein until seven days after disposition of any timely petition for rehearing. See D.C.Cir.Rule 15.
 
 MEMORANDUM
 
 4
 The Trustees of the 1950 and 1974 United Mine Workers of America Pension Plans (pension plans) seek to collect from Adkins Coal Company (Adkins Coal) and its partners a proportionate amount of pension contributions, also known as withdrawal liability,[1] that have not been paid since Incoal, Inc., a company with which Adkins Coal had done business, withdrew from the benefit plans. They contend that the District Court erred in dismissing their complaint against Adkins Coal, arguing that the company was a member of Incoal's controlled group, and as such is jointly and severally liable for the unpaid pension contributions. For the reasons set forth below, we affirm the District Court.
 
 I.
 
 5
 In 1974, the Adkins family leased coal reserves from Island Creek Company, formed Adkins Coal Company, a partnership,[2] to exploit the lease, and entered into a mining agreement with Incoal, Inc. whereby Incoal would mine the coal reserves. By October 1984, Incoal had completed its operations on the leased property; all available coal reserves had been exhausted, mining operations had ceased, and the site had been abandoned. On December 27 of that year, Adkins Coal received its final payment from Incoal. In March of 1985, a final distribution of $26,703.32 was made to the four individual Adkins partners, and the partnership ceased to have even a shadow of existence.
 
 
 6
 After the mining operations under the Island Creek lease had expired, Incoal continued to mine elsewhere for other companies. Consequently, it continued to contribute to the pension plans.[3] On February 15, 1985, however, Incoal ceased operations and completely withdrew from the pension plans.
 
 
 7
 The Trustees pursued Incoal to recover its withdrawal liability. Incoal failed to pay,[4] and the Trustees filed a complaint in the District Court. They alleged that when Incoal withdrew on February 15, 1985, pursuant to section 4203 of the Employment Retirement Income Security Act of 1974, (ERISA),[5] it became liable for $810,610.41 plus interest, liquidated damages, attorneys' fees and costs. Upon learning that others, including Adkins Coal and its partners, either had owned an interest of more than 1% in Incoal or had been a member of Incoal's controlled group prior to January 1980, the Trustees amended their complaint to include them as defendants. Although the Trustees conceded that neither Adkins Coal nor its partners were signatory to a UMWA contract or had contributed to or participated in the pension plans,[6] they contended that Adkins Coal, as part of a "brother-sister group"[7] along with Incoal and others, comprised a "single employer" of Incoal's employees who were jointly and severally liable for any withdrawal assessment that Incoal owed.[8]
 
 
 8
 The partners of Adkins coal moved to dismiss the complaint, principally arguing that the company was not a part of the controlled group because it had dissolved prior to Incoal's alleged withdrawal from the UMWA pension plans. The Trustees countered that Adkins Coal did not dissolve until after it distributed Incoal's final payment among the partners in March of 1985. But even if it had, they asserted, under Kentucky law the company still existed, both factually and legally, during the winding-up period; thus, it remained a "trade or business" under ERISA and subject to withdrawal liability.
 
 
 9
 The District Court, rejecting the Trustees' arguments, ruled that as a matter of law Adkins Coal and its partners were improperly made defendants in the suit. It found that although dissolution of the partnership did not terminate its existence, which continued until all affairs were wound up, nothing in the record indicated that operations continued past December 1984.[9] Thus, the court concluded, Adkins Coal could not have been a trade or business under common control at the time of Incoal's withdrawal from which any liability could arise. This appeal followed.
 
 II.
 
 10
 ERISA was designed to "establish[ ] funding and vesting standards for private pension plans."[10] Because of certain defects in that statute, the Multiemployer Pension Plan Amendments Act of 1980 (MPPAA)[11] was enacted to protect the retirees and workers who are covered by multiemployer plans[12] against the loss of their pensions.[13] Under MPPAA, both the employer and trades or businesses with which it is affiliated are held responsible for the withdrawal liability of the departing employer.[14] The identity of those liable for the unpaid contributions is determined on the date of the withdrawal.[15] No one disputes that Adkins Coal was once a member of the controlled group that included Incoal; at issue here is whether Adkins Coal was still a "trade or business" and thus a member at the time of Incoal's withdrawal.
 
 III.
 
 11
 Adkins Coal was organized under the partnership laws of Kentucky, which has adopted the Uniform Partnership Act. Under Kentucky law, dissolution is caused without violating the agreement between partners by, among other things, "the termination of the definite term of particular undertaking specified in the agreement."[16] "On dissolution the partnership is not terminated, but continues until the winding up of partnership affairs is completed;"[17] however, with some minor exceptions, liability is owed only for commitments made prior to dissolution.[18]
 
 
 12
 Here, the Trustees contend that Adkins Coal was a "trade or business" within the meaning of section 1301 at the time of Incoal's withdrawal, and therefore subject to the withdrawal liability. In support of their proposition, they argue first that the partnership did not dissolve in 1984. They claim that the purpose of the partnership included disbursement of payments to the partners, and that the final distribution did not occur until after the withdrawal in 1985. Appellants' argument is meritless.
 
 
 13
 Section 1301(b)(1) states that the regulations governing trades or businesses under common control shall be "consistent and coextensive" with section 414(c) of Title 26. ERISA's implementing regulations also direct us to section 414(c).[19] The term " 'trade or business' [however] is not clearly defined in either section 414(c) or the regulations promulgated thereunder."[20] Consequently, federal courts "consider[ing] this issue have engaged in an essentially factual inquiry."[21] We make this determination, of course, as a matter of federal law, but with some reference to the legal characteristics of the partnership as determined by Kentucky law. We find that competent and credible evidence in the record supports a finding that appellees' actions after 1984 demonstrated a winding-up process and not a continuation of the business. By the start of 1985, Adkins Coal had no further business engagements with Incoal or any other business concern. Rather, it distributed its partnership assets, an administrative task typically associated with winding up of business affairs.[22] Since the Trustees point to nothing more, we accept appellees' interpretation that the purpose of the Adkins Coal partnership was to exploit the Island Creek Lease, and concomitantly, embrace their position that once the associated business activity ceased, the partnership was dissolved.[23]
 
 
 14
 Next, the Trustees argue that even if Adkins Coal was operationally inactive after 1984, it was an existing legal entity during the winding-up period and therefore remained a "trade or business" within ERISA. In other words, they ask us to hold a business in its phase-out stages liable for debts incurred by another firm with which it no longer conducted business. This we cannot do.
 
 
 15
 A partnership that has arrested all business activity and is in the throes of winding up its affairs is, with some exceptions not relevant here, liable only for pre-dissolution debts.[24] In fact, "[t]he dissolution of a partnership operates only with respect to future new transactions, but as to everything past, including the performance of existing contracts, the partnership continues until all pre-existing matters are terminated."[25] Adkins Coal dissolved in 1984. The withdrawal liability was not incurred until 1985. Thus, under ordinary principles of partnership law, Adkins Coal cannot be held liable.[26]
 
 IV.
 
 16
 Adopting appellants' approach would neither advance the purpose nor the spirit of ERISA. We recognize that "ERISA (and the MPPAA) are remedial statutes, [and as such] should be liberally construed in favor of protecting the participants in employee benefit plans."[27] And we are mindful that "[t]he Supreme Court has 'consistently refused to give effect to the corporate form where it is interposed to defeat legislative policies,' "[28] and that " 'deferring too readily to the corporate identity may run contrary to the explicit purposes of [ERISA].' "[29] But we do not perceive Adkins Coal as asserting the dissolution of its partnership to deliberately "defeat" the "legislative policies" or "explicit purposes" of ERISA. Rather, we think it would be grossly inequitable to hold Adkins Coal liable for $810,610.41, as well as wholly incompatible with the statute's objectives, merely because it maintained a residual existence while winding up its partnership affairs some three months after the company had suspended basic operations and discontinued its working relationship with Incoal.[30] Since no statute should be so absurdly construed, and partnership law dictates that Adkins Coal and its partners be absolved of any responsibility for post-dissolution debts, we affirm the District Court's dismissal of the Trustees' complaint.[31]
 
 
 
 [1]
 The withdrawal liability of an employer is "the allocable amount of unfunded vested benefits." 29 U.S.C. Sec. 1381(b)(1) (1985). See also Park South Hotel Corp. v. New York Hotel Trades Council, 851 F.2d 578, 580 (2d Cir.), cert. denied, 109 S.Ct. 493 (1988) (withdrawal liability is equal to employer's proportionate share of plan's unfunded vested employee benefits or the difference between the present value of vested benefits and current value of plan's assets)
 
 
 [2]
 The company had no employees, office space, or telephone number. It also paid no wages or salaries, engaged in no economic activity, and did not participate in or maintain employee benefit plans. It did, however, collect a percentage of the net proceeds from the sale of the coal mined by Incoal
 
 
 [3]
 Brief for Appellees at 4
 
 
 [4]
 Incoal informed the Trustees it had depleted its assets and was financially unable to make payments
 
 
 [5]
 29 U.S.C. Sec. 1383 (1974)
 
 
 [6]
 Connors v. Incoal, Inc., 699 F.Supp. 3, 4 (D.D.C.1988)
 
 
 [7]
 When the Trustees amended their complaint, they had also added as a defendant Double A Farms which shared the same partners as Adkins Coal. It is those entities which the Trustees term a "brother-sister group" under common control that is jointly and severally liable for Incoal's withdrawal liability. According to the regulations, "brother-sister group" means " 'two or more organizations conducting trades or businesses if (i) the same five or fewer persons who are individuals, estates, or trusts own (directly and with the application of [26 CFR] Sec. 11.414(c)-4), singly or in combination, a controlling interest of each organization, and (ii) taking into account the ownership of each such person only to the extent such ownership is identical with respect to each such organization, such persons are in effective control of each organization.' " Board of Trustees v. LaFrenz, 837 F.2d 892, 893 (9th Cir.1988) (quoting 26 CFR Sec. 11.414(c)-2(c)(1))
 
 
 [8]
 "[A]ll employees of trades or businesses (whether or not incorporated) which are under common control shall be treated as employed by a single employer and all such trades and businesses as a single employer." 29 U.S.C. Sec. 1301(b)(1) (1985). See also 29 CFR Sec. 2612.3 (1989); 26 U.S.C. Sec. 414(b), (c), (f)(2) (1988 & 1990 Cum.Supp.). Accord Mason and Dixon Tank Lines, Inc. v. Central States, S.E. & S.W. Areas Pension Fund, 852 F.2d 156, 159 n. 2 (6th Cir.1988) (" 'if a terminating single employer plan is maintained by one or more members of a controlled group, the entire group is the "employer" and is responsible for any employer liability' ") quoting 126 Cong.Rec. S11672 (daily ed. Aug. 26, 1980) (statement of Sen. Williams)); Pension Benefit Guar. Corp. v. Ouimet Corp., 630 F.2d 4, 11 (1st Cir.1980), cert. denied, 450 U.S. 914 (1981) (same)
 
 
 [9]
 Connors v. Incoal Inc., supra note 6, 699 F.Supp. at 5
 
 
 [10]
 H.R. Report No. 869, 96th Cong., 2d Sess., reprinted in [1980] U.S.Code Cong. & Admin.News 2918, 2919
 
 
 [11]
 Pub.L. No. 96-364, 94 Stat. 1208 (1980) (codified at 29 U.S.C.A. Sec. 1001 et seq. (1985))
 
 
 [12]
 The term "multiemployer plan" refers to "a plan maintained pursuant to one or more collective bargaining agreements which cover the employees of two or more unaffiliated employers." H.R.Report No. 869, 96th Cong., 2d Sess., reprinted in [1980] U.S.Code Cong. & Admin.News at 2921
 
 
 [13]
 Id. at 2919
 
 
 [14]
 See note 8, supra
 
 
 [15]
 Connors v. Peles, 724 F.Supp. 1538, 1554 n. 12 (W.D.Pa.1989) (citing 29 U.S.C. Sec. 1391)
 
 
 [16]
 Ky.Rev.Stat. Sec. 362.300(1)(a), (b) (Michie/Bobb-Merrill 1987)
 
 
 [17]
 Ky.Rev.Stat.Ann. Sec. 362.295
 
 
 [18]
 See Ky.Rev.Stat.Ann. Sec. 362.325 ("[t]he dissolution of the partnership does not of itself discharge the existing liability of any partner") (emphasis added); see also Ky.Rev.Stat.Ann. Sec. 362.310, Sec. 362.320. Cf. Youmans v. Simon, 791 F.2d 341, 346 (5th Cir.1986) (after general partners dissolve the partnership, they become personally liable for pre-existing partnership debts)
 
 
 [19]
 See 29 CFR Sec. 2612.2 (1989) ("Trades or businesses (whether or not incorporated) which are under common control" has the same meaning as in section 414(c) of the Internal Revenue Code of 1954 ... and the regulations issued thereunder.") (emphasis in original)
 
 
 [20]
 Board of Trustees v. LaFrenz, supra note 7, 837 F.2d at 894 n. 6
 
 
 [21]
 Id
 
 
 [22]
 Ky.Rev.Stat.Ann. Sec. 362.335 states in pertinent part: "When dissolution is caused[,] ... each partner as against his copartners and all persons claiming through them in respect of their interest in the partnership, ... may have ... the surplus [of the partnership property] applied to pay in cash the net amount owing to the respective partners." See also Phillips v. Kaplus, 764 F.2d 807, 814 (11th Cir.1985), cert. denied, 474 U.S. 1059 (1986) ("distribution of partnership assets ... is the natural consequence of the winding up of partnership affairs"); Lebanon Trotting Ass'n v. Battista, 306 N.E.2d 769, 772 (Oh.App.1972) ("preservation of the partnership assets ... or ... the[ir] disposal, constitute proper action in connection with winding up the affairs of a partnership after dissolution")
 
 
 [23]
 Such inactivity is consistent with the principle that "[d]issolution brings to an end the ordinary business of the partnership." Ford v. Lafayette Life Ins. Co., 362 F.2d 970, 971 (D.C.Cir.1966)
 
 
 [24]
 See note 18, supra
 
 
 [25]
 Lebanon Trotting Ass'n v. Battista, supra note 22, 306 N.E.2d at 772
 
 
 [26]
 Cf. International Bhd. of Painters & Allied Trades Union v. George A. Kracher, Inc., 856 F.2d 1546, 1550 (D.C.Cir.1988) (chief officer and principal shareholder cannot be held liable for corporate debt arising out of delinquent-contribution liability); Connors v. P & M Coal Co., 801 F.2d 1373, 1376 (D.C.Cir.1986) ("[we find nothing in either the language or purpose of MPPAA ... to suggest that Congress intended to subject owner-operators of a closely held corporation to personal liability merely because they actively participated in running the business.")
 
 
 [27]
 IUE AFL-CIO Pension Fund v. Barker & Williamson Inc., 788 F.2d 118, 127 (3rd Cir.1986) (citing Rettig v. PBGC, 744 F.2d 133, 155 (D.C.Cir.1984)) (other citation omitted)
 
 
 [28]
 Lowen v. Tower Asset Management, Inc., 829 F.2d 1209, 1220 (2d Cir.1987) (quoting First Nat'l City Bank v. Banco Para el Comercio Exterior de Cuba, 462 U.S. 611, 630 (1983))
 
 
 [29]
 Id. at 1220-21 (quoting Alman v. Danin, 801 F.2d 1, 3 (1st Cir.1986))
 
 
 [30]
 Cf. In re Seatrain Lines, Inc., 46 B.R. 320 (Bankr.S.D.N.Y.1985) (bankrupt carrier not "employer" under MPPAA where it ceased payment of contributions for longshoremen who had been hired, fired, paid, and subject to direction and control of independent stevedores with which carrier had contracted)
 
 
 [31]
 In a footnote to its opening brief appellant suggested that it should have been permitted an additional opportunity for discovery. This is insufficient to raise the issue without sandbagging the appellee, and we do not address it